[No. 11339.  Department One.  December 5, 1913.]

SIMPSON LOGGING COMPANY, *Appellant*, v. AMERICAN
BONDING COMPANY OF BALTIMORE, *Respondent*,
NORTHWEST BRIDGE COMPANY, *Defendant*.[1]

PRINCIPAL AND SURETY—RELEASE OF SURETY—FAILING TO HOLD RESERVE—INDEMNITY BOND—LIABILITY.    The surety is discharged from liability on an indemnity bond guaranteeing a bridge contract, which required the owner to give notice in writing before paying the last or reserve payment of $7,000, where the owner paid all but $4,461, without giving any notice and then telegraphed the surety that the last payment of $7,000 was due and needed to meet pressing claims, and upon thereby obtaining authority to apply the reserve upon lienable items, overpaid the principal by several thousand dollars by paying claims an uncertain part of which were not lienable; since the surety is entitled by a "superior equity" to have the sum agreed upon held as indemnity until his rights and liabilities are determined.

SAME—PAYMENTS—MISAPPLICATION—LIENS — CONFUSED ACCOUNTS. Where a surety on a defaulted bridge contract authorized the reserve balance to be applied in taking up outstanding lienable items, the payment of any nonlienable items would be a misapplication of

[1]Reported in 137 Pac. 127.

the fund *pro tanto;* and where it is impossible to say to what extent the items were not lienable, no part would be lienable, under the rule of confused accounts.

CONTRACTS—BRIDGE CONTRACTS—CONSTRUCTION—"COST" OF STRUCTURE. Under a contract for the construction of a bridge for $31,000, providing that if the bridge company is unable to show a profit of ten per cent on "cost" of the bridge at said price, the owner will make the ten per cent good up to a maximum of $32,500, followed by a provision that "cost" is understood to cover all labor, materials, plant items, liability insurance, general expenses, and all other expenses and miscellaneous items which are chargeable against the job direct, the latter clause cannot be construed as requiring the bridge company to pay for every item of expense that the owner might be put to had it built the bridge itself; but merely as intended to fix the basis upon which to ascertain if the bridge company had made a profit and to limit the payments to be made over and above the contract price.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered March 1, 1913, dismissing an action upon an indemnity bond, after a trial on the merits to the court. Affirmed.

*Gordon & Easterday* and *T. P. Fisk,* for appellant.

*Chapman & Bailey* and *Frank H. Kelly,* for respondent.

CHADWICK, J.—This action was begun by plaintiff against the defendant to recover the sum of $2,606.44. Judgment was entered against the Northwest Bridge Company, and in favor of the American Bonding Company. On January 23d, 1911, the bridge company entered into a contract with the plaintiff to furnish all material and labor necessary to construct a bridge over the Satsop river, in Chehalis county, for the sum of $31,000. Payments were to be made as follows: $7,000 on March 10, 1911; $7,000 on April 10, 1911; $10,-000 on May 10, 1911; and the balance of $7,000 as soon as the work was completed and accepted. The bridge was to be completed on or before June 15, 1911. The contract provided, among other things, that, in the event that the bridge company did not make a profit of ten per cent on the cost of the bridge, the plaintiff would make the ten per cent good

up to a maximum sum of $32,500. The engagement of the bonding company was as follows:

"If the said principal shall faithfully perform said contract on its part, according to the terms, specifications, covenants, and conditions thereof (except as hereinafter provided), then this obligation shall be null and void, otherwise to remain in full force and effect."

It was further provided:

"The said owner shall notify the surety in writing before the last payment, or any reserve due the principal under said contract shall be paid."

The bridge company began the construction of the bridge and completed it about August 1st, 1911. The contract was completed according to the specifications and no liens have been filed against it. The bridge covered by the contract is referred to in the evidence as "bridge No. 2." It also appears that, at the time the contract was made, the bridge company was under contract to furnish the labor and material to construct another bridge, which is referred to as "bridge No. 1." Bridge No. 1 was about three-fourths completed at the time work was begun on bridge No. 2, and was entirely completed in March, 1911. The testimony does not show that the bridge company failed to make a profit of ten per cent on bridge No. 2. It shows a substantial loss on bridge No. 1, and probably shows that no loss was incurred by the bridge company on bridge No. 2.

At the time the first bridge was finished, the bridge company was indebted to the Lumberman's Mercantile Company in a large sum of money, approximately $6,000. Payments on bridge No. 2 were made as follows: $7,000 on March 9th, 1911; $7,000 on April 8th, 1911; $7,000 on May 8th, 1911, and $3,000 on June 13th, 1911. The logging company furnished to the bridge company tools, appliances, provisions and board for its workmen. It also paid to one H. E. Ford, on the bridge company's order, the sum of $1,500 for lumber. All of these sums were charged against the bridge company.

On June 30th, 1911, the account shows that the plaintiff had paid the bridge company $26,538.90, or $4,538.90 more than was then due under the contract. On July 14th, the bridge company notified plaintiff that it would not have enough money to meet its obligations, whereupon, plaintiff wired the bonding company as follows:

"The contractor informs us that the bridge will be ready for acceptance within a few days and that there are outstanding claims and bills to the amount of approximately ten thousand dollars, with a credit still due him as a final payment on the contract of seven thousand dollars, leaving approximately three thousand deficiency which he is unable to meet at this time and which we look to you to protect. Shall we apply the final payment of seven thousand dollars in liquidation of pressing claims and await final settlement of the remaining claims through your office."

The bonding company replied as follows:

"We consent to your applying balance of contract price in settlement of such lienable claims as may be approved for payment by the Northwest Bridge Company. This wire will not be construed as an admission of liability or waiver of any defenses under bond."

At the time the bonding company was notified, there was an actual balance due the bridge company of $4,461.10. Upon receipt of the last telegram quoted, plaintiff paid the following claims:

1911.

| | | | |
|---|---|---|---|
| July | 28 | W. S. Lumber Co | $1,137.48 |
| Aug. | 10 | J. E. Connolly | 439.38 |
| Aug. | 21 | H. E. Ford | 1,981.48 |
| July | 20 | Jos. Lazerous | 33.35 |
| Nov. | 14 | Pen. Ry. Co. | 101.95 |
| Nov. | 14 | Lumbermans Merch. Co. | 3,748.49 |

The difference between the amount owing and the amount paid is the sum sued for in this action. From a judgment dismissing the complaint, the plaintiff has appealed. We will refer to the bonding company as the defendant.

We agree with the conclusions of the trial judge that the evidence and the bill of particulars rendered by plaintiff is so confusing that a court cannot determine with any degree of certainty which items are lienable and which are not. Many legal propositions are advanced by the respondent to sustain the judgment. We will not discuss all of them, but content ourselves with inquiring whether plaintiff made overpayments in violation of its contract, and whether there were any mis-applications of payments.

It will be remembered that, at the time plaintiff notified defendant that the bridge company had defaulted, it told it that there was due the final award of $7,000. If this had been so, no liability would have come to the defendant. In this, however, the plaintiff was mistaken. The notification, nevertheless, must have indicated to the defendant that there had been no overpayment. It accordingly directed that that sum be applied in payment of lienable items. By the terms of the contract, defendant was entitled to have two things concur: notice of the last payment, and that the whole of the reserved payment be at hand at the time notice was given to it. It was the duty of the plaintiff to keep available the remedy that defendant had reserved unto itself. *Peters v. Mackay*, 20 Wash. 172, 54 Pac. 1122; *Liendecker v. Aetna Indemnity Co.*, 52 Wash. 609, 101 Pac. 219; *Black Masonry & Contracting Co. v. National Surety Co.*, 61 Wash. 471, 112 Pac. 517. And this is in accord with the great weight of authority. 32 Cyc. 223; *First Nat. Bank v. Fidelity & Deposit Co.*, 145 Ala. 335, 40 South. 415, 117 Am. St. 45, 5 L. R. A. (N. S.) 418.

The theory upon which the right of a surety to insist upon the retention of the reserve is based is that he is entitled to have the sum agreed upon held as indemnity and until his rights and liabilities are determined, and this, says the supreme court of the United States, is a "superior equity." *Prairie State Bank v. United States*, 164 U. S. 227. In *United States v. American Bonding Co.*, 89 Fed. 930, the

case of *Rees v. Berrington,* 2 Ves. Jr. 540, is quoted with approval. It says:

"It is the clearest and most evident equity not to carry on any transaction without the privity of him who must necessarily have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him. You must let him judge whether he will give that indulgence contrary to the nature of his engagement."

This court, in the cases cited, has held that sureties and guarantors are not to be held liable beyond the express terms of their engagement. This doctrine is well established and has the sanction of the supreme court of the United States. *Union Mut. Life Ins. Co. v. Hanford,* 143 U. S. 187. It is suggested in the brief of respondent that the cases, *Leghorn v. Nydell,* 39 Wash. 17, 80 Pac. 833, and *Monro v. National Surety Co.,* 47 Wash. 488, 92 Pac. 280, may be out of harmony with the *Peters, Leiendecker,* and *Black Masonry* cases, and that they are contrary to the current of authority. A reexamination of those cases is unnecessary. In so far as this case goes, they are sufficiently distinguished by what we have said of them in the *Black Masonry* case.

We are unable to say just how much of the several amounts paid is made up of lienable items. To a certain extent, they are not lienable under the authority of *Armour & Co. v. Western Const. Co.,* 36 Wash. 529, 78 Pac. 1106, and *Tsutakawa v. Kumamoto,* 53 Wash. 231, 101 Pac. 869, 102 Pac. 766; and payments made thereon are *pro tanto* misapplied, under the rule announced in *Crane Co. v. Pacific Heat & Power Co.,* 36 Wash. 95, 78 Pac. 460, and the whole demand would therefore fall within the rule of confused accounts and be nonlienable under the doctrine announced in *Gilbert Hunt Co. v. Parry,* 59 Wash. 646, 110 Pac. 541, Ann. Cas. 1912 B. 225.

Appellant insists, however, that the defendant is bound by the following items in the contract:

"It is also further agreed, that if the parties of the second part are unable to show a profit of ten per cent (10%) on *cost* of said bridge, piers and approaches, for the sum of $31,-000, the parties of the first part will make the ten per cent (10%) good up to a maximum sum of $32,500."

"By *cost* it is understood that the same covers all cost of labor, materials, plant items bought expressly for this work and consumed on the same, liability insurance on pay roll, general supervision, traveling expenses and all other expenses, such as miscellaneous items which are chargeable against this job, direct."

It is said that defendant was to do for plaintiff what plaintiff did not care to do—to build the bridge and pay for each and every item of expense that plaintiff might be put to had it built the bridge itself. We agree with counsel for respondent that this clause of the contract will not bear such construction, but that the words employed, when read in connection with the condition that the bridge company would furnish all "materials and labor necessary to construct ready for the rails, etc." mean that the defendant did not engage itself to pay more than actually went into the bridge and was chargeable "against the job, direct," under the contract and under the statute; and that the word "cost" should be read in connection with the previous stipulation that, if the bridge company was unable to show a profit of ten per cent on the "cost" of the bridge, plaintiff would pay a profit of ten per cent up to $32,500. We think the clause relied on was intended as a basis upon which to ascertain if the bridge company had made a profit and to limit the amount which appellant agreed to pay over and above the contract price in case a profit was not made.

The judgment is affirmed.

CROW, C. J., ELLIS, MAIN, and GOSE, JJ., concur.