## U. S. FIDELITY & GUARANTY CO. v. BANK OF BREWTON.

District Court, S. D. Alabama.
Aug. 5, 1933.

Coleman, Spain, Stewart & Davies, of Birmingham, Ala., for plaintiff.

Hamilton & Caffey, of Brewton, Ala., and Harry T. Smith & Caffey, of Mobile, Ala., for defendant.

ERVIN, District Judge.

The Gillis Bros. Construction Company had a contract with the state of Alabama to build three road projects. The complainant signed the bond of the construction company to the state guaranteeing the completion of one of these projects, namely S–90 and payment of the bills. The Bank of Brewton, respondent, advanced money to finance the three projects, taking assignments from the construction company of all sums payable to it by the state from all those projects and containing a power of attorney to indorse the name of the construction company on all of the pay checks issued by the state as the work progressed. These assignments were filed with the road department of the state. The proof shows that the bank made advances to the construction company without reference to the project, and, when advances were made, notes were taken by the bank for the amount of these advances, and, when the pay checks came in, again without reference to the project, these notes were paid out of the checks received by the bank.

It therefore does not appear what, if anything, was owing the bank for advances on project S–90 when the final check was received and appropriated by it.

The cashier of the bank testified that no account was kept by the bank of these advances showing the different projects for which the advances were made, and they had no means of proving this fact. He testified further that no entries were made on the books of the bank showing the cash the bank received from the state on the various projects or what moneys the bank advanced to the construction company; that, when the pay checks came, notes were taken up with the proceeds of the check and the notes returned to the construction company.

The contractor seems to have gotten behind with the bank which then took a mortgage on contractor's plant, including the mules, and on certain real estate.

The last two checks before the final one which were for comparatively small sums were placed by the bank to the credit of contractor's checking account in the bank.

When the work was finally completed and the publication duly made of that fact, as required by the contract, the state mailed to the bank a check payable to the construction company for the 15 per cent. held out from the pay checks.

The president of the bank had managed for the bank the whole transaction. After the completion of the work, and before its acceptance, one of the subcontractors, whose bill for about $7,000 had not been paid, discussed with the president of the bank this bill, and threatened to stop the final check, and the president told him that, if he would not do so, the bank would pay his bill out of the check when it came.

Such payment, however, was not made.

The check was received and indorsed in the name of the contractors and collected by the bank.

The next day it credited the mortgage that had been given it by the contractors with $11,000, and gave each of the two partners in the contracting firm its cashier's check for $1,000, and to the firm $752.36 in cash, and released the mules and contracting plant and the other two projects from the mortgage.

One of the subcontractors who had not been paid wrote the state complaining, and the state informed the surety of this fact.

The testimony showed: That the complainant made no effort to keep up with the progress of the work by the construction company as it progressed, but relied solely on reports made to it by the state as the state received notice of the failure of the construction company to pay the bills for labor and materials. That it had no notice of any default on the part of the construction company until after the final payment of $14,746.84 was made on January 26, 1929. This check was for $14,746.84, but only $13,843.49 was the percentage held up, and only that sum is involved. Its agent then went down to Montgomery and had an interview with the road department, and ascertained what payments had been made to the construction contractor, and from there to Brewton, where the agent had an interview with the president of the bank and with parties who claimed that the contractor owed them for labor and materials amounting to about $19,288.22. That he then learned that the bank had received the final payment and notified the bank that, if called on to pay these bills, they would look to the bank for reimbursement to the amount of this reserved percentage which had been received by the bank.

Suit was brought on the bond by the various parties who claimed amounts due them by the contractor and subcontractor, which resulted in judgment, and was paid by the surety, who then filed this bill, claiming subrogation.

The bank denies liability because: (1) It claims priority in right to the money; (2) that in effect the money has been paid to the contractors under the terms of the contract; (3) that the surety, by negligently failing to ascertain the fact of failure of the contractors to pay their bills, and stopping the final payment, have permitted it, in reliance upon the issue of the final check and its payment to them, to release security they held in the mortgage of the contractors.

As to the first question: This was considered in Prairie State Nat. Bank v. United States, 164 U. S. 227, 17 S. Ct. 142, 145, 41 L. Ed. 412, which holds two things, viz.:

"That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work, as for him for whom the work is to be performed, that it raises an equity in the surety in the fund to be created."

That the right of a surety on a contract to subrogation dates back to the execution of the surety contract.

We are not here concerned with the question of application of payments. That question arises only where the one who received a payment had the right as against his adversary to receive such payment, but equity required him at the instance of such adversary to apply such payment in a particular manner.

Here the question goes deeper and questions the right as between the two parties to receive the payment. Of course, if, as between the surety and the bank, the surety had a prior equity in the fund or percentage held back by the state, then the bank had no right to such payment, and that is the holding of the Prairie State Nat. Bank Case.

It is true that in that case the surety took over and completed the performance of the work called for in the contract, while in this one the failure of the contractors was to pay their bills, but this makes no difference; in each case there was a failure of the contractor to do what its contract required, and the surety was called on and required to make good this failure of the contractor, and was so subrogated to the rights of the subcontractors. Many other cases might be cited but this is the leading case and settles the proposition.

In the Prairie State Nat. Bank Case the final payment was still held by the government, while in the instant case the bank has collected it before the surety knew there had been a default by the contractor, and the surety, having been compelled to pay the subcontractors, is now seeking to require the bank to account to it for such money.

If the surety had an equity in the fund prior to the claim of the bank as assignee of the contractor as held in the Prairie State Nat. Bank Case, then the surety should have the right to require the bank to account, for the bank knew all the facts when it received

the fund. U. S. Fid. & Guar. Co. v. Bristow (D. C.) 4 F.(2d) 810; Cox v. New England Equitable Ins. Co. (C. C. A.) 247 F. 955; Labbe v. Bernard, 196 Mass. 551, 82 N. E. 688, 14 L. R. A. (N. S.) 457; Mass. Bonding & Ins. Co. v. Chouteau Trust Co. (C. C. A.) 264 F. 793; So. Surety Co. v. Merchants' & Farmers' Bank (Ind. App.) 159 N. E. 3.

■■ As to the second question: In fact the check was not sent to or received by or indorsed by or collected by the contractor.

It is true the indorsement by the bank was under a power of attorney from the contractor, but in this whole transaction the bank was acting for itself and in its own interest; it took the assignments and powers of attorney for its own protection and not in the interest of the contractor.

The contractor had a checking account in the bank at this time, but the bank, while it filled out a deposit slip, did not deposit the proceeds or any part of it in this account and have the contractor draw checks against it in payment of any sum they owed the bank.

On the contrary, it used the deposit slip it filled out as a memorandum so as to keep the whole transaction off their books.

In fact, no entry of this transaction appears to have been made on any book of the bank.

The two cashier's checks for $1,000 each wrongfully given to the two Gillises seems according to the testimony of C. U. Gillis to have been intended to put this money as well as the cash then paid over to them beyond the reach of their creditors.

These checks and the cash were the only portion of this check that ever got into the possession of the contractors.

The bank at that time knew all the facts, that this was the final payment, and that, while the contractor had completed the work, it had not paid the bills for the work. They also knew that there was a surety for the performance by the contractor.

Knowing these facts, they also knew that this final payment was liable for these unpaid bills, and that, if the surety should be called on to pay them, it had a lien on this reserved percentage.

It is held, and I think correctly, in the cases already cited that, as long as this percentage held back to secure the performance of the contract can be identified and followed, it can be subjected in equity to the lien of the surety. There is no doubt in this case that the bank received and appropriated the proceeds of this check, and that such portion of it they did not retain was paid out by them in an effort to put it beyond the just claim of those who had the prior right to be paid out of it.

■ As to the third: It is urged that complainant was negligent in not keeping up with the performance by the contractor with its work and its payments to its subcontractors. That, if it had investigated, it would have learned the facts prior to the issuance by the highway department of the final or reserve payment. It may be that the facts would have been ascertained upon investigation, but that is not the question.

Was there any duty to investigate?

Contracts are executed with the purpose of being performed, not breached, so complainant owed no duty to supervise its performance or inquire as to whether the contractor had paid his subcontractors until it had some information tending to show such failure by the contractor.

Suppose the surety had made inquiry and learned that the contractor did owe its subcontractors and their employees, before the final check was drawn.

This was no more than the bank knew when it received the check and applied $11,000 of it to the debt of the contractor and credited the mortgage with that sum and released a part of the security covered by the mortgage.

How can it complain of the negligence and delay of the surety when everything it did was done with full knowledge of the facts? What omission of the surety caused it to innocently change its position for the worse?

It is true that equity will not aid one who by his negligent act, omission, or delay has misled another into changing his position for the worse.

How was the bank misled?

What it did was not caused by any act or omission of the surety, but by its effort to get into its possession a fund it knew was pledged to pay liens held by others, whom it was then misleading into delaying the enforcement of their rights. Chouteau Trust Co. v. Mass. Bonding & Ins. Co. (C. C. A.) 1 F.(2d) 136 (8).