THE AETNA CASUALTY AND SURETY COMPANY *vs.*
HARVARD TRUST COMPANY & another.

Middlesex.    January 5, 1962. — April 11, 1962.

Present: WILKINS, C.J., SPALDING, WILLIAMS, CUTTER, & KIRK, JJ.

*Assignment.    Surety.    Subrogation.    Notice.    Loan.    Law or Fact.*

Whether a contractor made an oral assignment of the proceeds of a building contract was a question of fact.    [166]

Even though, upon default by a contractor doing construction work for a public body and completion of the work by the surety on the contractor's performance and payment bonds, the surety's inchoate rights by subrogation and under conditional assignments in the application for the bonds matured as of the time of furnishing the bonds, a bank which had financed the contractor by loans in connection with the project was entitled to retain, as against the surety, money paid by the public body to the contractor and by him to the bank on account of the loans and received by the bank in good faith before it had actual knowledge of the contractor's default.    [168-169, 174]

As against a bank which financed by loans a contractor doing construction work for the United States, the surety on the contractor's performance and payment bonds was entitled, by reason of its rights of subrogation and under assignments in the application for the bonds, to money paid by the United States to the contractor and by him to the bank on account of the loans after the bank had acquired actual knowledge of the bonds and of default on the part of the contractor; the bank was not aided by assignments purportedly made by the contractor to it under the Federal assignment of claims act after it had acquired such knowledge, nor was the bank aided by G. L. c. 107A in connection with purported assignments, junior to the rights of the surety, by the contractor to the bank of particular invoices due from the United States.    [175-178]

Where the application to the surety on performance and payment bonds furnished by a contractor pursuant to a contract for public construction work with a city contained an assignment of money payable by the city and a provision that "any security . . . in connection with" such bonds "including the assignment . . . may be held . . . as a protection against any bond heretofore or hereafter executed . . . on behalf of the" contractor, and the surety also became surety on similar bonds furnished by the contractor to the United States pursuant to contracts with it, the surety, upon default by the contractor under his contracts with the United States and incurring of expense by the surety in completing the work thereunder, became entitled to reimbursement for such expense from still unpaid proceeds of the city contract in priority to a bank which had

lent money to the contractor and taken purported assignments from him after the furnishing of the bonds to the city, even though the surety had incurred no expense in connection with the city contract.   [178]

BILL IN EQUITY, filed in the Superior Court on July 23, 1959.

The suit was reported by *Bolster, J.*

*Edward O. Proctor,* (*Elmer W. Beasley* of Connecticut, with him,) for the plaintiff.

*Waldo Noyes,* (*Sumner R. Andrews* with him,) for the defendants.

CUTTER, J.   This is a bill in equity brought by the surety company (Aetna) against the trust company (Harvard) and D. C. Loveys Company (Loveys) to determine the priorities of Aetna and Harvard with respect to funds earned under six construction contracts.   A master's report was confirmed.   A Superior Court judge has reported the case without decision upon the amended pleadings, the master's report, and a short supplemental stipulation.

Loveys conducted a contracting business, largely with the United States and with municipalities.   It required financing.   In 1954, Loveys made "an oral agreement with Harvard for a [$200,000] line of credit."   "Loveys was to secure each . . . loan . . . by assigning to Harvard all the proceeds . . . from . . . contracts so financed . . . and, in addition . . . to secure each . . . loan by assignments of specific accounts receivable" represented by invoices for "work already performed sent . . . by Loveys."   Loveys "was to . . . disburse all . . . funds" so lent "solely in the performance of . . . contracts financed . . . by Harvard, and to deliver . . . to Harvard promptly . . . all payments from . . . owners received by Loveys."   The oral agreement was "renewed at the inception" of each contract.

From April 14, 1954, to June 13, 1957, "Loveys entered into five contracts with the United States."   Aetna is surety on Miller Act performance and payment bonds (see 40 U. S. C. [1952] § 270a) on each of these contracts, which (so far as it may be a question of fact) the master found became a part of the respective contracts.

On July 1, 1955, Loveys also made a contract with the city of Cambridge to construct a school.[1]  Aetna is surety on performance and payment bonds on this contract.  See G. L. c. 149, § 29 (as amended through St. 1938, c. 361[2]).

Loveys delivered to Aetna (apparently with respect to each contract) a bond application purporting (in par. Third) to assign to Aetna all tools, equipment, and materials for the contract at the work site or elsewhere, upon the condition, among others, that the "assignment shall be in full force . . . as of the date hereof: (1) Should the . . . principal(s) fail to pay any premium . . . or should [it] . . . be unable to complete . . . any contract covered by a bond of this [c]ompany, or in the event that . . . [the] principal(s) . . . fail to comply with the terms . . . of any such contract . . . (3) If the principal(s) fail to pay bills incurred on the work, when they become due and payable . . . ."[3]

The contracts with the United States[4] "provided for partial payments to Loveys . . . as the work progressed . . .

---

[1] On August 14, 1958, Loveys brought an action against the city of Cambridge for labor and materials furnished in connection with that contract, alleging that the city committed various breaches of contract.

[2] Section 29 has been revised further by St. 1955, c. 702, § 2, and St. 1957, c. 682, § 1.

[3] Each bond application provided further, "Fourth: That the . . . surety . . . as of this date, shall be subrogated to all rights . . . of the principal(s) in said contract, and . . . [the] principal(s) . . . assign . . . to . . . [the surety] the deferred payments and retained percentages arising out of this contract, and any . . . monies . . . that may be due and payable to said principal(s) at the time of . . . any of the occurrences mentioned in clauses one . . . [and] three . . . of . . . [par. Third] or that may thereafter become due and payable to said principal(s) on account of this contract . . . hereby agreeing that all such monies . . . shall be the sole property of the . . . [surety] and . . . [shall] be by it credited upon any loss . . . sustained . . . by it . . . under any bond or suretyship . . . for the . . . principal(s)."

[4] Each such contract provided that (pursuant to the Assignment of Claims Act of 1940, as amended, 31 U. S. C. [1952] § 203; 41 U. S. C. [1952] § 15) "claims for moneys due or to become due . . . [to Loveys] under this contract may be assigned to a bank, trust company or other financing institution . . . . Any such assignment . . . shall cover all amounts payable . . . and not already paid, and shall not be made to more than one party, except . . . [exception not applicable].  Notwithstanding any other provision of this contract, payments to an assignee of any moneys due or to become due under this contract shall not, to the extent provided in said [a]ct as amended, be subject to reduction or set-off."

on estimates made . . . by . . . [the contracting] officer . . . [and] for the retention by the government of 10% of such estimated amounts until final . . . acceptance of all work" subject to provisos not now relevant. Loveys subcontracted part of the work under each prime contract by written subcontracts which provided for payments by Loveys on the twentieth of each month for work done during the preceding month.

Loveys notified Harvard of each contract and "that Loveys would need financing therefor . . .." As Loveys needed money, it obtained a loan, "executing a so called 'nonpurpose collateral note' to Harvard to which was attached an assignment of book accounts and copies of Loveys' current invoices to the . . . [United States] or the [c]ity of Cambridge, upon which Harvard then . . . [made a loan to] Loveys by crediting Loveys' account in . . . Harvard with 80% of the invoiced amounts. . . . [A]s these invoices were paid by the . . . [United States] or the [c]ity . . ., Loveys deposited the checks in its account at Harvard and drew against them checks to Harvard in like amounts, generally in even dollars, which were credited on Loveys' note or notes held by Harvard; . . . [t]hese contracts as carried on Loveys' general ledger were stamped 'Assigned to . . . Harvard . . .' by stipulation of Harvard and with a rubber stamp supplied by Harvard." When Loveys' notes to "Harvard became due new notes would be made out and executed by Loveys, reduced by the . . . payments made, if any, and . . . any collateral assignments which had not been realized upon would be carried over to the new note." No other "writings, written assignments of contracts, or the future proceeds thereof, or documents were executed by . . . Loveys and Harvard in connection with the contracts . . . prior to February 10, 1958, unless the stamping of Loveys' ledger sheets . . . constitutes such an assignment."

Loveys' drawings from its checking account at Harvard "were not confined to the purposes of the contracts against which the loans were given" but "Loveys drew from this

account . . . for all purposes." Harvard "exercised no control over this account or the purposes for which Loveys withdrew funds"; nor did Harvard "attempt to ascertain whether Loveys used the proceeds of any loan" for a particular contract. Prior to February 10, 1958, Harvard "gave no notice to Aetna of its loans . . . nor did it" notify the contracting and disbursing officers of the United States or of Cambridge. Harvard's representative knew that some United States contracts "were required to be covered by bonds but did not know which ones." He "made no inquiry" whether bonds were required and was not familiar with the notice requirements of the Assignment of Claims Act, but was familiar with the Massachusetts requirements of payment bonds on municipal contracts. He first learned of the Federal notice requirements from Aetna's counsel on February 3, 1958.

"Harvard acted in good faith in its dealings with Loveys and without actual knowledge . . . of the execution by Loveys" of the bond applications already mentioned. Aetna knew as early as September, 1955, that Loveys was being financed by Harvard.

On November 30, 1956, "Loveys had paid . . . all its indebtedness to Harvard." Thereafter, Harvard lent Loveys a cumulative total of $981,000 under its credit arrangement. Harvard's last advance was $49,000 on August 8, 1957. From December 1, 1956, to February 28, 1958, Loveys expended substantially more than $981,000 on these contracts.

From September 10, 1956, as money became payable under the contracts with the United States, to and including January 20, 1958, the sum of $433,269.96 was received by Harvard under its assignments, without notice to Aetna. Under one contract (Westover) $35,013.56 was paid to Harvard on February 6, 1958, and under another (Quonset) $4,900 was paid on February 11, 1958. Of these aggregate payments of $473,183.52, those beginning on April 30, 1957 ($438,023.52, including those made on February 6 and 11, 1958), were made during a period when Loveys (as is de-

scribed below) was not paying promptly invoices of its subcontractors and suppliers.

As of April, 1957, Loveys was more than a month in arrears in meeting substantial aggregate invoices from its subcontractors on three contracts, all for work and materials furnished prior to the invoices. On November 27, 1957, Loveys became "admittedly unable" to complete the contracts without assistance from Aetna and so advised Aetna. In addition to various difficulties such as hurricanes, strikes, and change orders, Loveys had "diverted contract moneys from . . . [these] contracts . . . to pay . . . costs on contracts not bonded by Aetna and for other purposes." Such diversion of contract money caused Loveys' failure to pay its subcontractors and materialmen promptly. No party "claimed . . . that the contract moneys earned were not sufficient to pay all completion costs." On February 3, 1958, Aetna first notified Harvard that it claimed to be Loveys' assignee.

On February 10, 1958, Loveys assigned to Harvard (apparently in purported compliance with the Assignment of Claims Act; see fn. 4, *supra*) all proceeds then remaining due and to become due under two contracts with the United States (Beverly and Westover) and the Federal agencies concerned, after notice from Harvard, accepted the assignments and paid to Harvard $4,858 and $108,995.01. These sums were paid by Harvard to Aetna under a stipulation on February 26, 1958, that "if Aetna would assist Loveys . . . by financing the . . . [contracts], Aetna would be permitted to receive the payments thereafter made . . . on . . . [the] contracts" without prejudice to the "rights of Harvard and Aetna to assert their . . . claims with respect to these and all other payments."

Aetna in completing the contracts (except that with Cambridge on which it made no payment) properly paid, in accordance with its bonds, $317,659.03 from its own funds. This aggregate sum was in addition to $4,858 and $108,995.01 received by Harvard from the United States and paid by Harvard to Aetna under the stipulation. Aetna has stipu-

lated that, prior to February 3, 1958, Aetna "took no steps to examine Loveys' financial condition, its progress on the contracts with the . . . [United States], or to protect its rights."

Aetna seeks to recover from Harvard $317,659.03, the amount which Aetna spent in completing the contracts, above the $113,853.01 received by Aetna under the stipulation of February 26, 1958. This latter sum Aetna desires to retain. In order to recover the former sum, Aetna seeks to reach both the $433,269.96 received from Loveys by Harvard before February 3, 1958, and also the $39,913.56 received by Harvard on February 6 and 11, 1958. Harvard seeks to recover from Aetna $49,122.44, the balance due to Harvard on Loveys' note, and to retain the sums of $433,269.96 and $39,913.56.

All relevant events took place prior to October 1, 1958, when the Uniform Commercial Code (now G. L. c. 106) became effective. See St. 1957, c. 765, § 21.

1. The master found that Harvard made with Loveys an "oral agreement . . . for a line of credit and the operation of the same" and concluded that, "in so far as it is a question of fact, Loveys never orally assigned to Harvard the future proceeds of the contracts." The conclusion is consistent with the subsidiary findings. Although we assume that, in some circumstances, there may be a valid oral assignment (see *Crocker* v. *Whitney,* 10 Mass. 315, 319; *Currier* v. *Howard,* 14 Gray, 511, 513; see also *Matter of Cle-Land Co. Inc.* 157 F. Supp. 859, 860 [D. Mass.]; Williston, Contracts [3d ed.] § 430) it would be "a *question of fact* whether the . . . [assignor] had transferred his rights" (emphasis supplied). See *Heard* v. *Calkins,* 234 Mass. 526, 529–530. See also *Swift-McNutt Co. of R. I.* v. *Cohen,* 264 Mass. 48, 50–51; Restatement: Contracts, § 149 (1); Williston, Contracts (3d ed.) §§ 428, 429.

2. Aetna, as surety, acquired (as of the date of issuing the bonds on each contract) certain inchoate, equitable rights which might be asserted on principles of subrogation in the event that it should be called upon to satisfy any of

Loveys' obligations.   In *Labbe* v. *Bernard,* 196 Mass. 551,
A, B, and C were cosureties upon a bond given by one Rod-
gers for the performance of a contract.   Rodgers did part
of the work, received part of the price, and then abandoned
the contract.   A finished the work.   He became entitled to
receive from the landowner the balance of the price, which
was slightly more than A.'s expenses.   Rodgers had bor-
rowed money of A to carry on the work and as security as-
signed to A all his claims under the contract.   A sought by
bill in equity to compel B and C "to contribute ratably to
the amount thus paid by him to complete the work . . .
without giving any credit for the amount which he [had]
received."   This court said (p. 552) that when "the sure-
ties . . . should complete the work . . . they would become
subrogated to all . . . [Rodgers'] rights under the con-
tract and entitled to receive whatever part of the . . . price
had not been paid."   A, "having alone completed the work
and received what remained due . . . might . . . charge
. . . his cosureties, ratably with himself, the cost of com-
pleting the work, but he must give . . . credit for . . .
[what] he received therefor."   The opinion went on to say
(pp. 552–553) "While . . . the rights of the sureties to the
remedies of the principal . . . are incapable of present en-
forcement until they shall have discharged their principal's
obligation, yet their right becomes an inchoate one as soon
as they have entered into the relation of suretyship; and
their equitable assignment of their principal's rights and
remedies, when completed by their performance of his obli-
gation, relates back, as against each other and their princi-
pal, to that earlier time. . . .   And all persons who have in
the meantime received any securities or payments from
either party to the principal contract, *with notice of the
facts and of the surety's responsibilities and consequent
rights,* must in equity hold them for his benefit. . . .   The
plaintiff . . . *having full knowledge of all the facts* it is un-
necessary to consider what would have been his rights, if
he had taken his assignment *without notice* of the equitable
rights of his cosureties" (emphasis supplied).   The court

in the *Labbe* case relied upon *Prairie State Bank* v. *United States,* 164 U. S. 227, in which the rights of a surety upon a performance bond given in 1888 were held superior to the rights of a bank which had lent money to the contractor on the security of written authority to the bank from the contractor to receive the final payment of the contract price. The *Prairie State Bank* case has been followed, upon similar facts, by a long line of decisions. See, e.g., *Henningsen* v. *United States Fid. & Guar. Co.* 208 U. S. 404; *Hardaway* v. *National Sur. Co.* 211 U. S. 552; *Royal Indem. Co.* v. *United States,* 93 F. Supp. 891 (Ct. Cl.); *National Sur. Corp.* v. *United States,* 133 F. Supp. 381 (Ct. Cl.), cert. den. sub nom. *First Natl. Bank* v. *United States,* 350 U. S. 902.

Without explicit reference to the doctrine of subrogation, this court in *Commercial Cas. Ins. Co.* v. *Murphy,* 282 Mass. 100, 104–105, reached a result (based upon a security assignment to the surety) consistent with that in the *Labbe* case, 196 Mass. 551. It decided that the surety should take, as against an attaching creditor, the portion of the contract price retained in the hands of the town for which the work was being done. See *Duteau* v. *Salvucci,* 330 Mass. 531, 536.

In Massachusetts, a prior assignee will take in preference to a later assignee, even though the obligor has not been given notice of the prior assignment. The prior assignee, however, risks payment by the obligor to later assignees before the obligor has notice of the prior assignment. See *Goodyear Tire & Rubber Co.* v. *Bagg,* 292 Mass. 125, 128, and cases cited. See also *Great Am. Indem. Co.* v. *Allied Freightways, Inc.* 325 Mass. 568, 570–571;[5] *Salem Trust Co.* v. *Manufacturers' Fin. Co.* 264 U. S. 182, 199.

3. Aetna contends that the aggregate payments by Loveys to Harvard prior to February 3, 1958, "should have

---

[5] Other Massachusetts decisions are less directly relevant. A surety cannot enforce subrogation until he has wholly satisfied the principal's liability. See *Westinghouse Elec. & Mfg. Co.* v. *Fidelity & Deposit Co.* 251 Mass. 418, 421. See also *Hill* v. *Wiley,* 295 Mass. 396, 403. An assignee of a contractor's claim takes the assignment subject to the potential right of the other contracting party to assert claims for breach of contract by the assignor. See *American Bridge Co. of New York* v. *Boston,* 202 Mass. 374, 375.

been paid to the surety, or . . . to Loveys' subcontractors and materialmen''; and that Aetna has a superior equity in these funds ''which . . . Harvard received in error.'' We summarize the principal facts pertinent to this contention.

Prior to February 3, 1958, neither Harvard nor Aetna had imposed any restrictions upon the use of Loveys' bank account. Payments from it had not been limited to the purposes of particular contracts. Both Harvard, as banker, and Aetna, as surety, seem to have trusted Loveys and until knowledge of Loveys' default were entitled to do so. See *American Fid. Co.* v. *National City Bank,* 266 F. 2d 910, 917 (Ct. App. D. C.). Harvard after November 30, 1956, had lent Loveys $981,000 and Loveys, during this period, had spent a larger sum on these contracts, thus undoubtedly expediting payments for labor, materials, and subcontractors' work, and reducing the likelihood that Aetna would have to advance funds therefor. There is no indication that Harvard, prior to February 3, 1958, had actual knowledge of the Miller Act bonds, or of the assignments to Aetna, or of Loveys' delays in paying its suppliers and subcontractors. Aetna, on the other hand, knew of Loveys' delays in paying its subcontractors and suppliers on November 27, 1957, and ''as early as September 1955, . . . was aware that Loveys was being financed in its construction projects by Harvard.'' Because of its knowledge, Aetna could have notified Harvard of its assignments and inchoate claims by way of subrogation, and could have attempted to require Loveys to place progress payments in a controlled account. Aetna did nothing ''to protect its rights prior to February 3, 1958.''

Harvard prior to February 3, 1958, was repaid from Loveys' general bank account (in which government payments were deposited) some of the loans which have facilitated performance of the contracts. It must be determined whether Aetna can reach these repayments either because of its prior assignments (see *Bank of Ariz.* v. *National Sur. Corp.* 237 F. 2d 90, 95–96 [9th Cir.]) or because of the principles of subrogation.

(a) Harvard, as a creditor of Loveys or as second assignee, if it had been paid debts owing to it from funds in Loveys' general bank account without notice of the prior assignments to Aetna, would be entitled to retain the payments against Aetna as prior assignee. See *Rabinowitz* v. *People's Natl. Bank,* 235 Mass. 102, 103–104; *Goodyear Tire & Rubber Co.* v. *Bagg,* 292 Mass. 125, 128; Restatement: Contracts, § 173 (b); Williston, Contracts (3d ed.) § 435, pp. 221, 225; Corbin, Contracts, § 902, pp. 617–618. See also *American Employers Ins. Co.* v. *School Dist. of Newport,* 99 N. H. 188, 192. Compare *Aetna Cas. & Sur. Co.* v. *Eastern Trust & Banking Co.* 156 Maine, 87, 95, 99–102, which "rests on the application of" a Maine statute relating to assignments specifically protecting the prior assignee. The master has found that Harvard had no notice prior to February 3, 1958, of the prior assignments to Aetna.

(b) In deciding whether Harvard may retain the payments, which it received prior to February 3, 1958, against Aetna's equitable claims by way of subrogation, we must consider the scope[6] fairly to be given to these equities against persons dealing in good faith with Loveys without actual knowledge of any default by that company. In respect of payments prior to February 3, 1958, the situation, of course, is not one where the fund sought to be reached is still in the hands of the United States (see, e.g., the *Prairie State Bank* case, 164 U. S. 227; *Moran* v. *Guardian Cas. Co.* 76 F. 2d 438 [Ct. App. D. C.]) or the contractor. Cases in the line of authorities between *Henningsen* v. *United States Fid. & Guar. Co.* 208 U. S. 404, 410, and *National Sur. Corp.* v. *United States,* 133 F. Supp. 381 (Ct. Cl.), (even if it be assumed that the latter case and *Royal Indem. Co.* v. *United States,* 93 F. Supp. 891 [Ct. Cl.], were correctly decided; see comment, 20 U. of Chicago L. Rev. 119) are not controlling where the funds have been paid over to a creditor or assignee of the contractor prior to his having notice of the

---

[6] See as to the public interest in having public contracts financed by bank loans, *Central Bank* v. *United States,* 345 U. S. 639, 646–647; *General Cas. Co.* v. *Second Natl. Bank,* 178 F. 2d 679, 681–682 (5th Cir.). See also *River Junction* v. *Maryland Cas. Co.* 110 F. 2d 278, 281 (5th Cir.).

contractor's default. Only cases involving attempts to recover such payments are relevant.

In the *Labbe* case, 196 Mass. 551, 553, this court pointed out that "persons who have . . . received any securities or payments from either party to the principal contract, *with notice of the facts and of the surety's responsibilities and consequent rights,* must in equity hold them for" (emphasis supplied) the surety's benefit. Although (see p. 553) it was not there necessary to decide what would have been the rights of an assignee receiving payment from the principal without notice of the subrogation rights, the case does not preclude the conclusion that payment cuts off such rights. Of course, where the person receiving payment has notice of all the facts giving rise to the surety's interest, the moneys paid over may be followed. See *Martin* v. *National Sur. Co.* 300 U. S. 588, 593–598; *United States Fid. & Guar. Co.* v. *Bank of Brewton,* 4 F. Supp. 272, 273–274 (S. D. Ala.). See also *United States Fid. & Guar. Co.* v. *Bristow,* 4 F. 2d 810, 811–812 (E. D. Okla.). There is suggestion, however, in *McKenzie* v. *Irving Trust Co.* 323 U. S. 365, 372–373, that the payment could not be reached when taken without notice of the contractor's defaults. Certain other decisions also point to this conclusion, although the authorities are not unanimous and are somewhat confusing. Also, in part at least, some recent decisions rest upon the provisions of the Assignment of Claims Act of 1940, as amended.

In *California Bank* v. *United States Fid. & Guar. Co.* 129 F. 2d 751, 754–755 (9th Cir.), a surety was denied the right to reach a fund paid over by the United States to the contractor and by the latter paid to a bank creditor who had no notice of the contractor's default. The court said (p. 755) that the surety's "right in the fund was acquired by subrogation long after . . . [the bank] received . . . [the payment. The surety,] however, contends that its right relates back to the date of the bonds. That is true as to . . . [the contractor] and as to claimants standing in . . . [the contractor's] shoes — as, for example, an assignee claiming

the fund by virtue of an assignment of . . . [the contractor's] rights under the contracts'' (citing in a footnote the *Prairie State Bank, Henningsen* and *Hardaway* cases). Such an assignee would be subject to the surety's rights of subrogation which related back to the date of the bonds.[7] Nevertheless, it held that the surety's equity and the doctrine of relation back ''cannot be used by a subrogee for the purpose of recovering money paid to a creditor without notice, in satisfaction of a just debt, prior to the maturing of any right of subrogation.''

Various other cases are consistent with the result in the *California Bank* case, 129 F. 2d 751, although some of these depend in part on the provisions of the Assignment of Claims Act. See *Bank of Ariz.* v. *National Sur. Corp.* 237 F. 2d 90, 93–94 (9th Cir.); *American Fid. Co.* v. *National City Bank,* 266 F. 2d 910, 914–917 (Ct. App. D. C.); *United States Cas. Co.* v. *First Natl. Bank,* 157 F. Supp. 789, 794– 798 (M. D. Ga.). See also *Kane* v. *First Natl. Bank,* 56 F. 2d 534, 535–536 (5th Cir.); *River Junction* v. *Maryland Cas. Co.* 110 F. 2d 278, 281, 283 (5th Cir.), cert. den. 310 U. S. 634, *S. C.* 133 F. 2d 57; *Fidelity & Deposit Co. of Md.* v. *Union State Bank,* 21 F. 2d 102, 104–106 (D. Minn.); *Maryland Cas. Co.* v. *Lincoln Bank & Trust Co.* 40 F. Supp. 782, 784–786 (W. D. Ky.); and dictum in *Massachusetts Bonding & Ins. Co.* v. *New York,* 259 F. 2d 33, 37 (2d Cir.).[8] Cf. *Pacific Indem. Co.* v. *Grand Ave. State Bank,* 223 F. 2d

---

[7] The reference in the opinion to ''an assignee claiming the fund by virtue of an assignment of . . . [the contractor's] rights'' is ambiguous and confusing. In view of the citation of the *Prairie State Bank* (164 U. S. 227), the *Henningsen* (208 U. S. 404), and the *Hardaway* (211 U. S. 552) cases, we interpret the statement (although its meaning is not free from doubt) as meaning no more than that an *unpaid* assignee stands no better than the contractor while the assigned funds are still in the hands of the contractor or the government.

[8] There are other authorities generally to the same effect. See *Third Natl. Bank* v. *Detroit Fid. & Sur. Co.* 65 F. 2d 548, 549–550 (5th Cir.); *Maryland Cas. Co.* v. *National Bank & Trust Co.* 320 Pa. 129, 132, 134–135. We assume that, even after the decision in *United States* v. *Munsey Trust Co.* 332 U. S. 234, 239–244, a surety on a payment or performance bond may be subrogated to claims against retained funds in the hands of the government or the contractor. See *Matter of Dutcher Constr. Corp.* 197 F. Supp. 441, (W. D. N. Y.), affd. 298 F. 2d 655 (2d Cir.). See also *Continental Cas. Co.* v. *United States,* 169 F. Supp. 945, 946–947 (Ct. Cl.).

513, 518 (5th Cir.).   Compare also *J. J. Struzziery Co. Inc.* v. *A. V. Taurasi Co. Inc.* 340 Mass. 481, 486, *S. C.* 342 Mass. 113, treating "*retained* funds . . . [as] in the nature of a trust" (emphasis supplied) for those entitled to the statutory security contemplated by G. L. c. 30, § 39, prior to its repeal by St. 1957, c. 682, § 2.[9]

Aetna contends that Harvard had constructive notice of Aetna's claims because as Loveys' assignee it was charged with knowledge of the requirements of the Miller Act.   See *Martin* v. *National Sur. Co.* 300 U. S. 588, 597–598; *Standard Acc. Ins. Co.* v. *Federal Natl. Bank,* 112 F. 2d 692, 695 (10th Cir.), where the surety was preferred to the financing bank as to retained funds; *Royal Indem. Co.* v. *United States,* 93 F. Supp. 891, 894, 899 (Ct. Cl.); *National Sur. Corp.* v. *United States,* 133 F. Supp. 381, 384–385 (Ct. Cl.). Nevertheless, even if it be assumed that Harvard is charged with constructive notice of Aetna's bonds, it would not necessarily follow that, in the absence of actual knowledge, Harvard had notice, either of the specific assignments in the bond applications or of Loveys' defaults in paying its suppliers and subcontractors.   We assume that a bank in the position of Harvard should recognize that the surety may have to make payments under its bonds if the contractor defaults, but this does not mean that the bank must inquire whether such a default exists before accepting each payment of indebtedness due from the contractor.   As the *American Fid. Co.* case (266 F. 2d 910, 917) points out, "Until default occurred the bank had a right to trust the contractor, just as the sureties did.   The latter could have, but did not, require joint control."   See Corbin, Contracts, § 901, at p. 609.   Any notice arising from the contract itself and the statutory bond requirements cannot reasonably be extended to charge an assignee or creditor of the contractor,

[9] The payments made to Harvard prior to February 3, 1958, have not been shown to have been procured by fraud (see *American Fid. Co.* v. *National City Bank,* 266 F. 2d 910, 916 [Ct. App. D. C.]; see also *Martin* v. *National Sur. Co.* 300 U. S. 588, and the *McKenzie* case, 323 U. S. 365, 373) or made by mistake by the government to Loveys, and by Loveys to Harvard.   See *Newark Ins. Co.* v. *United States,* 181 F. Supp. 246, 248–249 (Ct. Cl.), where, however, all parties had notice and there was "no question about tracing . . . funds."

acting in good faith (as the master found Harvard did "in its dealings with Loveys"), with knowledge of the contractor's defaults, or to impose upon the assignee any duty of inquiry about such defaults.    Cf. *Elbar Realty, Inc.* v. *City Bank & Trust Co.* 342 Mass. 262, 269–270.

We conclude that there is no claim to recover the payments made to Harvard prior to February 3, 1958, which Aetna as surety may now enforce.    This view does not disregard the inchoate equity of subrogation or fail to give effect to the conditional assignment to the surety (see Corbin, Contracts, § 875).    It does require proof that an assignee or creditor, receiving payment otherwise in good faith, had actual knowledge that the contractor had committed a material breach, before the surety's equity will be enforced against that payment.

In holding that Harvard may retain the payments received prior to February 3, 1958, we have not relied upon the equitable considerations (a) that Aetna, with knowledge of Loveys' defaults and of Harvard's financing of Loveys, failed to notify Harvard of the circumstances, or (b) that Harvard's advances, to the extent applied to the contracts, reduced the risks of the surety.    Although Harvard's loans appear to have been spent largely upon the contracts, Harvard did not enforce such expenditure.    Because Loveys did divert contract moneys to complete contracts not bonded by Aetna, it is uncertain to what extent Harvard's loans paid obligations which Aetna otherwise would have had to pay.    See the *River Junction* cases, 110 F. 2d 278, 281; 133 F. 2d 57, 59; *Coconut Grove Exch. Bank* v. *New Amsterdam Cas. Co.* 149 F. 2d 73, 78–79 (5th Cir.).    Because Loveys spent more than the total amount of Harvard's loans on the bonded contracts, the overall effect of the loan transactions was not harmful to Aetna, even if Harvard is to retain the payments received before Harvard had notice of Loveys' defaults.    Compare the *Coconut Grove* case, *supra,* where the assignee bank was permitted to retain funds paid to it even after knowledge of default, in part at least because the surety had not established that the bank's advances had not been of benefit to it.

4.  We next consider the payments made to Harvard under the various contracts after February 3, 1958, and the effect of the agreement of February 26, 1958, between Harvard and Aetna.

(a)  We need not decide whether Aetna's claims (against contract funds, not paid to Harvard prior to February 3, 1958) by way of subrogation and based upon its prior assignment would have been subordinate to those of Harvard, if Harvard had taken and perfected, prior to making any advances, an assignment or assignments which fully complied with the requirements of the Assignment of Claims Act as amended through 1951.  Compare the *Coconut Grove Exch. Bank* case, 149 F. 2d 73, 76–78, with the somewhat restrictive interpretation of the purposes of the Assignment of Claims Act by the Court of Claims in the *Royal Indem. Co.* case, 93 F. Supp. 891, and the *National Sur. Corp.* case, 133 F. Supp. 381, discussed in notes, 37 Va. L. Rev. 328, 41 Va. L. Rev. 984, and 20 U. of Chicago L. Rev. 119.  See *Central Bank* v. *United States,* 345 U. S. 639, 646.  We also need not consider whether the express reference in each contract to the Assignment of Claims Act, and the possibility of assignments under that act, constituted in any degree consent by Aetna to such assignments made to secure current or future advances.  The fact is that Harvard knew that Loveys had already committed breaches of its contract obligations by February 10, 1958, when Loveys purported to make assignments to Harvard in compliance with the act.  Nothing in the Assignment of Claims Act seems to us to permit a contractor, actually in default, to make, to a bank with notice of the default, an assignment under the act which will be free of a surety's matured right to subrogation.  Particularly should this be true, where (as was the case with Harvard) no new advances are made upon the strength of such an assignment.  See *Pacific Indem. Co.* v. *Grand Ave. State Bank,* 223 F. 2d 513, 516–519 (5th Cir.). Harvard took these assignments of February 10, 1958, subject to all the consequences of the defaults which had then occurred and about which it knew.  See *American Bridge Co. of N. Y.* v. *Boston,* 202 Mass. 374, 376.

(b) The first few payments made to Harvard after February 3, 1958 ($4,900 on February 11, 1958, $35,013.56 on February 6, 1958, and the $18,090.79 paid by Harvard to Aetna on April 7, 1958, on the Westover contract), were each wholly or partly secured by a purported assignment by Loveys to Harvard of a particular invoice then due. Before each such payment, Harvard knew of the prior assignments to Aetna and of Aetna's matured claims by way of subrogation. Under the *Labbe* case, 196 Mass. 551, 552–553, Harvard (in the absence of circumstances giving Harvard a stronger equity than that of Aetna) could not take these payments free of Aetna's prior assignment or equitable rights, unless in some manner Harvard receives protection from G. L. c. 107A, § 4, inserted by St. 1945, c. 141, § 1 (repealed by St. 1957, c. 765, § 2, but continued in effect by § 19 as to transactions validly entered into prior to the effective date of the 1957 statute). See Craig, Accounts Receivable Financing, 65 Harv. L. Rev. 627; Malcolm, Explanation and Analysis of St. 1945, c. 141, 30 Mass. L. Q. (No. 2) 26.

Neither the conditional assignment to Aetna in each bond application nor Aetna's inchoate equitable right by way of subrogation constituted an assignment of an "account," as that term is defined in G. L. c. 107A, § 1, which excluded "sums [under an existing contract] to become due for goods not yet completed or services not yet rendered." Aetna's rights thus do not rest upon c. 107A. General Laws c. 107A, § 2, states that an "assignment of an account transfers . . . all rights *which the assignor has power* to transfer" (emphasis supplied). The italicized language is an implied negation of power to transfer rights either already assigned or otherwise not within the assignor's control. In view of this language, Loveys had by virtue of § 2 no special power to assign particular invoices to Harvard free of Aetna's prior assignment rights and inchoate subrogation rights. Section 4 provides that if an account is assigned under § 2, "the assignor and any subsequent assignee . . . and any creditor of such assignor, *other than a creditor*

*realizing on a lien acquired prior to such assignment,* shall be liable . . . to the assignee . . . for all sums thereafter received by such assignor, subsequent assignee or creditor in payment . . . of such account . . .'' (emphasis supplied). Section 4 also provides that ''any action to enforce any rights *under this section* against any party other than the assignor shall be commenced only within one year from the date such funds are received'' (emphasis supplied). Aetna, by virtue of its prior assignment rights and its inchoate lien, is in effect a creditor of Loveys attempting to realize on a ''lien acquired prior to'' any assignment to Harvard of particular invoices. We think that c. 107A affords Harvard no assistance.

(c) Reference already has been made (in discussing the payments to Harvard prior to February 3, 1958) to the circumstance that the proof leaves uncertain the extent to which Harvard's loans to Loveys were expended upon contract obligations which Aetna otherwise would have had to pay. Harvard did not (1) effectively ensure that money lent by it would be spent only upon contract obligations, and (2) did not take precautions (by perfecting assignments under the Assignment of Claims Act, or otherwise) to prevent Loveys from diverting payments under these contracts. We need not consider, however, whether these facts prevent Harvard from retaining or recovering funds paid by the government after February 3, 1958, or whether, if Harvard had controlled Loveys' expenditure of its loans and the government payments, it would have had an equitable claim prior to that of Aetna's subrogation claims, on the ground that Harvard's funds had relieved Aetna pro tanto of possible expenditures under its bonds. See the *Coconut Grove Exch. Bank* case, 149 F. 2d 73, 78–79. The controlling answer to any claim by Harvard to such a priority is that Aetna had a conditional assignment under each contract prior to any assignment to Harvard of an invoice under that contract. Such prior assignments must prevail (at least in the absence of a valid and perfected assignment under the Assignment of Claims Act, or subordination of

the prior assignment) except as to funds received by Harvard from Loveys prior to February 3, 1958.

5. Aetna claims that it is entitled to reach the proceeds of the Cambridge contract under the cross-application provisions of the assignment in each of its bond applications, viz., that "[a]ny security . . . in connection with . . . [the] bond, including the assignment . . . may be held . . . as a protection against any bond heretofore or hereafter executed . . . on behalf of the . . . principal(s)." The assignment in the Cambridge contract was executed July 1, 1955. An action by Loveys against Cambridge, with counts for labor and materials furnished and breach of contract, was pending at the time of the trial. It is not clear what, if anything, remains due under that contract, or with respect to what items, but anything hereafter paid will have been paid after the maturity of Aetna's rights to reimbursement for its unreimbursed expenditures for Loveys on the contracts with the United States.

Such a cross-application provision may operate with some hardship to a later assignee of one of the contracts affected if the assignee does not procure a subordination of the surety's assignment to that of the assignee. Nevertheless, similar provisions have been upheld as valid by other courts. See *Lacy* v. *Maryland Cas. Co.* 32 F. 2d 48, 53–54 (4th Cir.), as to retained percentages; *Re Allied Prod. Co.* 134 F. 2d 725, 726–728 (6th Cir.), cert. den. sub nom. *Barnett* v. *Maryland Cas. Co.* 320 U. S. 740; *Gray* v. *Travelers Indemn. Co.* 280 F. 2d 549, 553–555 (9th Cir.). Compare *Bridgeton Natl. Bank* v. *Commercial Cas. Ins. Co.* 117 N. J. Eq. 371, 377–380. As to funds not paid to Harvard prior to February 3, 1958, the application provisions, in the circumstances, give to Aetna a claim to the proceeds of the Cambridge contract, prior to that of Harvard, based upon its later advances.

6. A decree is to be entered in the Superior Court declaring (1) that Harvard is entitled to retain all payments made to it by Loveys prior to February 3, 1958; (2) that Harvard is to pay to Aetna the sum of $35,013.56, paid to it

on February 6, 1958, and the sum of $4,900 paid to it on February 11, 1958, together with interest from the date of Aetna's demand for such payments; (3) that Aetna is to retain all payments made to it under the agreement of February 26, 1958; and (4) that Aetna has a claim prior to that of Harvard, in any amount remaining payable under the Cambridge contract. Each party is to pay the cost of its own briefs on this report. The cost of preparing the record shall be shared equally by Harvard and Aetna.

*So ordered.*