INSURANCE COMPANY OF NORTH AMERICA, Plaintiff, Appellant,

v.

NORTHAMPTON NATIONAL BANK, Defendant, Appellee.

No. 82–1726.

United States Court of Appeals, First Circuit.

Argued Feb. 2, 1983.

Decided May 23, 1983.

As Amended on Denial of Rehearing June 16, 1983.

**14**

Paul W. Orth, Hartford, Conn., with whom John T. Harris and Hoppin, Carey & Powell, Hartford, Conn., were on brief, for plaintiff, appellant.

Saul Gliserman, Northampton, Mass., with whom Edward D. Etheredge, Brownell, Gliserman, Washburn, Etheredge, Gervais & Kaplan, Northampton, Mass., were on brief, for defendant, appellee.

Before ALDRICH, BOWNES and BREYER, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

This is an action brought by Insurance Company of North America (INA), surety for a general contractor, M.I. O'Connor, Inc., against Northampton National Bank of Springfield, Massachusetts, to recover the amount of O'Connor's general deposit account at the time that the bank set off the account against O'Connor's overdue loan. The account consisted of part of the proceeds of a progress payment paid to O'Connor by the Wing Memorial Hospital Association for work done in August, and deposited on October 6, 1971. INA contends that by virtue of its contract with O'Connor, the latter having been in default with respect to timely payments to subcontractors by October 1, it had an assignment of the progress payment from which it could not be cut off by the bank's exercising a right of setoff when the bank had notice, or knowledge, thereof. The case was tried largely on a stipulation of facts. In an extensive opinion the court ruled that since INA had not established knowledge by the bank of INA's interest, the setoff was effective. The court may well have been correct that notice alone would not be sufficient, but finding knowledge established, we reverse.

O'Connor was engaged in a number of projects, but overall not doing well financially. An internal audit showed as of September 30, 1971, sizeable earning and capital deficits. O'Connor regularly used funds from one project to pay costs on others, and as early as May, 1971, was experiencing difficulties paying subcontractors and materialmen on the Hospital project. This was a serious lapse because its contract with the Hospital required it to pay,

> "each of [its] subcontractors, not later than the 5th day following each payment to the Contractor, the respective amounts allowed the Contractor on account of the work performed by [its] subcontractors to the extent of each subcontractor's interest therein."

By the end of September, 1971 O'Connor was overdue on payments to at least seven subcontractors or materialmen, and by early October one subcontractor had already made demand directly to INA. By letter on October 13 the architect, whose duty it was to approve progress payments, although continuing to praise the work complained to O'Connor of its delays in payments. Representatives of O'Connor and INA met on October 15, O'Connor announcing that it could not go on, and asking INA to take over the Hospital project. INA agreed to do so. O'Connor's unpaid subcontractors were discussed. INA took over on October 22.

One W.H. Brownell, Esq. attended the meeting as counsel for O'Connor. He had been counsel for O'Connor for many years. He had also, for many years, represented the bank. The parties have stipulated that after the meeting he went to the bank and stated that,

> "O'Connor would cease operations as of that day, that O'Connor had seven jobs at various stages of completion bonded by either the Surety [INA] or the United States Fidelity & Guaranty Company, that he had met with O'Connor and the

Surety previously that day, and that at least as of October 15, 1971, he continued to represent both O'Connor and the Bank. [He] further advised the Bank to put a hold on the O'Connor checking account."

The bank did so. The following business day, Monday, October 18, Brownell again went to the bank, and advised it to set off O'Connor's account against the overdue loan, which the bank did. He further told the bank he could no longer represent either side in connection with O'Connor matters.

INA ultimately suffered a greater loss on the Hospital project than the set off account, and brought this suit to recover the amount of the latter.

■■■ There can be no question as to a bank's general right to set off a general checking account. *Laighton v. Brookline Trust Co.,* 1917, 225 Mass. 458, 460, 114 N.E. 671. This right prevails against a general creditor. *See* Mass. G.L. c. 246, § 26; *Sternheimer v. Harris,* 1925, 253 Mass. 169, 148 N.E. 447. We agree, however, that under what appears to be a standard clause in O'Connor's and INA's indemnification contract, INA had a claim to all moneys and proceeds of the Hospital's payments "in the event of any breach, default or abandonment of the contract" to which the bond relates. However, this right would not prevail against a party who received the funds in ignorance of the surety's rights. *Aetna Casualty & Surety Co. v. Harvard Trust Co.,* 1962, 344 Mass. 160, 171–74, 181 N.E.2d 673; *Labbe v. Bernard,* 1907, 196 Mass. 551, 553, 82 N.E. 688.

■■■ Receipt may have more than one meaning. We will put the question in the form most favorable to the bank: Was O'Connor in default before October 6, maturing INA's claim before the check was received, and did the bank learn of this prior to effecting the setoff on October 18? *

Unfortunately, the court did not address the question of default before October 6, finding it irrelevant, since it found the bank had no knowledge in any event. We have reviewed the stipulation and conclude that INA must prevail on this issue. The Bank's evidentiary arguments to the contrary, such as that the Hospital had transmitted the check without objection, and the architect later wrote that the work was first class, are insufficient to meet the admitted facts of record. On the issue that default had to be formally declared, we rule in favor of INA; there was no such necessity. Such a requirement would make form prevail over substance. *First Alabama Bank v. Hartford Accident & Indemnity Co.,* N.D.Ala., 1977, 430 F.Supp. 907, 912.

We can accept that the bank had no independent knowledge on October 18 of defaults prior to October 6, and that Brownell did not affirmatively inform it thereof, but this brings us to the question of imputation, to the bank, of Brownell's knowledge. Again, unfortunately, the court dealt neither with Brownell's knowledge, nor with the question of imputation. Surprisingly, although the matter was clearly presented, neither does the bank deal with the latter in its brief.

■■■ As to Brownell's knowledge, given the fact that he attended the October 15 meeting as O'Connor's counsel, and that the meeting was for the express purpose of informing INA of O'Connor's state of affairs, it could not be that Brownell was not aware, or did not then become aware, of the basic facts. While we would have preferred that the court had made a finding, as it was asked to do, we conclude that there could be but one answer: that he was aware.

The parties briefed below whether Brownell's communicating with the bank, following the October 15 meeting, was a breach of a fiduciary duty to O'Connor, whom he had represented at the meeting. It does not seem to us to have been a breach. What

---

* The Bank properly asserts that it had to have notice of INA's rights before it "actually received the funds." However, as *Aetna Casualty & Surety Co. v. Harvard Trust Co.,* 344 Mass. at 174, 181 N.E.2d 673, makes clear, the Bank's "receiving payment" was by the set-off on October 18, not by acceptance of the deposit on October 6.

was decided at that meeting, viz., that O'Connor was having to quit, and was calling in INA, was to become a matter of public knowledge almost immediately. INA might have preferred that Brownell not spread the word forthwith, but he was not its counsel. Nor was there evidence that anyone told him he was not to communicate.

▮ It is, of course, true that an agent's knowledge will usually not be imputed to a principal when the communication thereof would be a breach of duty to someone else. See Restatement (Second) of Agency § 281. The case at bar, however, is not simply a question of silent imputation. Brownell affirmatively communicated information, and the bank consciously took advantage of it. The bank is estopped from asserting that ordinary agency principles do not apply when it voluntarily participated.

▮ Even apart from privilege, it is also true that in the absence of any communication the mere fact that Brownell was the bank's regular counsel (but not, apparently, an officer or director) did not, of itself, mean that whatever he learned in another capacity was to be imputed to the bank. *Vietor v. Spalding,* 1908, 199 Mass. 52, 84 N.E. 1016. However, when, on October 15, Brownell came to the bank and gave it not only information, but advice to put a hold on O'Connor's account, and on October 18, advice to effect a setoff, certainly he came as counsel, and not as a stranger. The bank could not accept the advice and disassociate itself from the adviser; it would be altogether too facile to take the good and close one's eyes to the bad. Having accepted Brownell's counsel in the matter, under familiar agency principles Brownell's knowledge must have come along, as well.

The most apt language is to be found in *NLRB v. Ben Duthler, Inc.,* 6 Cir., 1968, 395 F.2d 28, 32, where a question arose of whether the president of an employer, in dealing with the union, was to be regarded as knowing what his counsel knew. The trial examiner found the president lacked the personal knowledge and experience. After finding that counsel whom the presi-

dent consulted did have knowledge and experience, however, the court said,

> "Whatever knowledge and experience his attorney had must be attributed to Mr. Duthler, who acted in accordance with his attorney's advice."

A corporate principal acts through agents, and cannot be protected by fragmentation of knowledge and action. *E.g., Continental Casualty Co. v. United States,* 1 Cir., 1964, 337 F.2d 602, 603. We hold that the bank was bound by its attorney's knowledge. *See Manfredi v. O'Brien,* 1933, 282 Mass. 458, 185 N.E. 365. Nor would there seem any great inequity in this. If Brownell had not given it the advice, very possibly it would not have attempted the setoff in the first place until manifestly too late.

An issue remains; how much INA is entitled to recover. INA seeks to recover the $29,042.53 actually set off early on October 18. The Bank would have it that this amount should be reduced by an additional $2,365.23 posted thereafter and carried as an overdraft by the Bank for three months. The Bank attempted to introduce evidence of this late posted amount only at trial, before then admitting the $29,042.53 figure in its answer, and in answers to interrogatories. Instead of addressing the matter, the court stated "Whether it is $29,000, or $26,000 is really immaterial," and, referring back to the answers, cut off the evidence. We are not clear as to immateriality. Very possibly some of this $2,365. went to reduce INA's liability. Since the case must be remanded for computation of interest, the court, before entry of final judgment, may wish to reconsider this relatively minor aspect.

*Reversed.*