# PRAIRIE STATE BANK *v.* UNITED STATES.

## UNITED STATES *v.* HITCHCOCK.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 10, 16. Argued October 13, 14, 1896. — Decided November 30, 1896.

S. contracted with the United States, in 1888, to erect a custom-house at Galveston. H. was his surety on a bond to the United States for the faithful performance of that contract. The contract gave the government a right to retain a part of the price until the work should be finished. In consideration of advances made, and to be made, by a bank, S. gave it in 1890, written authority to receive from the United States the final contract payment so reserved. The Treasury declined to recognize this authority, but consented, on the request of the contractor, to forward, when due, a check for the final payment to the representative of the bank. Later S. defaulted in the performance of his contract, and H., as surety, without knowledge of what had taken place between the bank, the contractor and the Treasury, assumed performance of the contract obligations, and completed the work, disbursing, in so doing, without reimbursement, an amount in excess of the reserved final payment. The bank and H., each by a separate action, sought to recover that reserved sum from the government. The cases being heard together it is *Held*, that, a claim against the government not being transferable, the rights of the parties are equitable only, and the equity, if any, of the bank in the reserved fund, being acquired in 1890, was subordinate to the equity of H. acquired in 1888.

The real contestants in the controversy below were the Prairie State National Bank and Charles A. Hitchcock, who respectively claimed the right to receive from the government

a balance in its hands of $11,850. This balance arose by the retention from time to time of ten per cent upon the estimated value of work done under a contract entered into on May 10, 1888, by the government with Charles Sundberg & Company, wherein they agreed for the consideration of $118,590 to erect a custom-house at Galveston, Texas. The right of the government to retain the reserved sums was founded upon the following provision in the contract:

"Payments to be made in the following manner, viz.: ninety per cent (nine tenths) of the value of the work executed to the satisfaction of the party of the first part will be paid from time to time as the work progresses in monthly payments, (the said value to be ascertained by the party of the first part), and ten per cent (one tenth) thereof will be retained until the completion of the entire work and the approval and the acceptance of the same by the party of the first part, which amount shall be forfeited by said party of the second part in the event of the nonfulfillment of this contract, subject, however, to the discretion of the Secretary of the Treasury; it being expressly stipulated and agreed that said forfeiture shall not relieve the party of the second part from liability to the party of the first part for all damages sustained by reason of any breach of this contract."

While the respective claims were pending before the Comptroller of the Treasury, and at his request, the Secretary of the Treasury transmitted the same to the Court of Claims under § 1063, Rev. Stat.

The bank bases its claim to the fund upon the following state of facts: On February 3, 1890, in consideration of advances made and to be made by the Prairie Bank, Sundberg & Company gave to one Van Zandt, a representative of the bank, an order or power of attorney, authorizing him to receive from the United States the final payment under the contract. The Acting Secretary of the Treasury declined to recognize this power of attorney, but expressed a willingness, on request of the contractors, to forward, when it became due, the check for the final payment to the address of Van Zandt. Being informed by the latter that this arrangement would

be satisfactory to the contractor and himself, the Assistant Secretary of the Treasury gave direction to the disbursing agent of the building to send the final check, drawn to the order of the contractor, to the address of Van Zandt.   Between February and May, 1890, upon the faith of the lien upon the final payment alleged to have been acquired by this arrangement, the bank advanced to Sundberg & Company about six thousand dollars, but, although it was claimed by the bank that the amount of the advances in question were, in large part, actually used in the performance of the contract of Sundberg & Company, the Court of Claims failed to find such to be the fact.   It is true that the court, in one of its findings, gives "a full and accurate statement of the checking, deposit and loan accounts between the bank and Sundberg & Company from January 24, 1890, to August 15, 1890," but to whom the checks were made payable or for what purpose they were issued does not appear.

Hitchcock's claim to the fund was asserted upon the ground that in May, 1890, Sundberg & Company defaulted in the performance of their contract, and that thereupon he, as surety, without any knowledge of the alleged rights of the bank, assumed the completion of the contract with the consent of the contractors, and that he had disbursed therein about fifteen thousand dollars in excess of the current payments from the government.   The bond which Hitchcock executed as surety was made pursuant to the following provision contained in the contract between Sundberg & Company and the government:

"It is further covenanted and agreed between the parties to this contract that the party of the second part shall execute, with two or more good and sufficient sureties, a bond to the United States in the sum of thirty thousand dollars ($30,000), conditioned for the faithful performance of this contract and the agreements and covenants herein made by the said party of the second part."

The Court of Claims held that Hitchcock was entitled to the fund, 25 C. Cl. 185, and entered judgment accordingly. The Prairie Bank thereupon appealed, and a cross appeal was

taken by the United States in order that it might be protected from a double liability, in the event this court should hold that the Prairie Bank was entitled to any part of the fund.

*Mr. Howard Henderson* and *Mr. A. B. Browne* for Prairie State Bank. *Mr. A. T. Britton* was on their brief.

*Mr. George A. King* for Hitchcock. *Mr. Rufus H. Thayer* was on his brief.

*Mr. Assistant Attorney General Dodge* for the United States.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

The question to be determined is which of the two contestants possesses a superior right to the fund. It is self-evident that, considering the agreements between Sundberg & Company and the bank as an intended transfer *pro tanto* of the rights of the latter to the results of the contract with the United States, such transfer would be void under § 3477, Rev. Stat. This position was not controverted in the discussion at bar, but it was asserted that as the bank had advanced money to complete the building and thus to enable Sundberg & Company to perform their contract obligations with the government, therefore the bank had an equitable lien upon the ten per cent retained by the government paramount to any lien in favor of Hitchcock, whose lien, it was contended, only arose from the date of his advances made to execute the contract upon Sundberg's default.

Thus the respective contentions are as follows: The Prairie Bank asserts an equitable lien in its favor, which it claims originated in February, 1890, and is therefore paramount to Hitchcock's lien, which it is asserted arose only at the date of his advances. The claim of Hitchcock, on the other hand, is that his equity arose at the time he entered into the contract of suretyship, and therefore his right is prior in date and paramount to that of the bank.

In considering these conflicting claims, it must be recognized at the outset that the terms of the original contract made by the United States with Sundberg were in nowise affected or changed by the agreements subsequently made between Sundberg and the Prairie Bank. Not to so consider would be admitting the application of section 3477 on the one hand, and then immediately proceeding to deny its effect on the other. We shall, therefore, in examining the rights of the parties proceed upon the hypothesis that the contract made by the United States remained in full force and effect, and that the rights, if any, of both parties to this controversy were subject to its terms.

That Hitchcock, as surety on the original contract, was entitled to assert the equitable doctrine of subrogation is elementary. That doctrine is derived from the civil law, and its requirements are, as stated in *Ætna Life Insurance Company* v. *Middleport,* 124 U. S. 534 : " 1, that the person seeking its benefits must have paid a debt due to a third party before he can be substituted to that party's rights; and, 2, that in doing this he must not act as a mere volunteer, but on compulsion, to save himself from loss by reason of a superior lien or claim on the part of the person to whom he pays the debt, as in cases of sureties, prior mortgagees, etc. The right is never accorded in equity to one who is a mere volunteer in paying a debt of one person to another." See authorities reviewed at pages 548 *et seq.*.

As said by Chancellor Johnson in *Gadsden* v. *Brown,* Speer's Eq. So. Car. 37, 41 (quoted and referred to approvingly in the opinion in *Insurance Co.* v. *Middleport,* just referred to), " The doctrine of subrogation is a pure unmixed equity, having its foundation in the principles of natural justice, and from its very nature never could have been intended for the relief of those who were in any condition in which they were at liberty to elect whether they would or would not be bound; and, as far as I have been able to learn its history, it never has been so applied. If one with the perfect knowledge of the facts will part with his money, or bind himself by his contract in a sufficient consideration, any rule of

law which would restore him his money or absolve him from his contract would subvert the rules of social order. It has been directed in its application exclusively to the relief of those that were already bound who could not but choose to abide the penalty."

Under the principles thus governing subrogation, it is clear whilst Hitchcock was entitled to subrogation, the bank was not. The former in making his payments discharged an obligation due by Sundberg for the performance of which he, Hitchcock, was bound under the obligation of his suretyship. The bank, on the contrary, was a mere volunteer, who lent money to Sundberg on the faith of a presumed agreement and of supposed rights acquired thereunder. The sole question, therefore, is whether the equitable lien, which the bank claims it has, without reference to the question of its subrogation, is paramount to the right of subrogation which unquestionably exists in favor of Hitchcock. In other words, the rights of the parties depend upon whether Hitchcock's subrogation must be considered as arising from and relating back to the date of the original contract, or as taking its origin solely from the date of the advance by him.

A great deal of confusion has arisen in the case by treating Hitchcock as subrogated merely "in the rights of Sundberg & Co." in the fund, which, in effect, was saying that he was subrogated to no rights whatever. Hitchcock's right of subrogation, when it became capable of enforcement, was a right to resort to the securities and remedies which the creditor (the United States) was capable of asserting against its debtor Sundberg & Company, had the security not satisfied the obligation of the contractors, and one of such remedies was the right based upon the original contract to appropriate the ten per cent retained in its hands. If the United States had been compelled to complete the work, its right to forfeit the ten per cent and apply the accumulations in reduction of the damage sustained remained. The right of Hitchcock to subrogation, therefore, would clearly entitle him when, as surety, he fulfilled the obligation of Sundberg & Company, to the government, to be substituted to the rights which the United

States might have asserted against the fund. It would hardly be claimed that if the sureties had failed to avail themselves of the privilege of completing the work, they would not be entitled to a credit of the ten per cent reserved in reduction of the excess of cost to the government in completing the work beyond the sum actually paid to the contractor, irrespective of the source from which the contractor had obtained the material and labor which went into the building.

That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work as for him for whom the work is to be performed; that it raises an equity in the surety in the fund to be created; and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority. Thus in *Calvert* v. *London Dock Co.*, 2 Keen, 638, (1838,) where a contractor had undertaken to perform certain work, and it was agreed that three fourths of the work, as finished, should be paid for every two months, and the remaining one fourth upon the completion of the whole work, it was held that the sureties for the due performance of the contract were released from their liability by reason of payments exceeding three fourths of the work done having been made to the contractor without the consent of the sureties before the completion of the whole work. To the argument that the extra advances really went into the work and so enured to the benefit of the sureties, Lord Langdale, Master of the Rolls, answered as follows (p. 644):

"The argument, however, that the advances beyond the stipulations of the contract were calculated to be beneficial to the sureties, can be of no avail. In almost every case where the surety has been released, either in consequence of time being given to the principal debtor, or of a compromise being made with him, it has been contended that what was done was beneficial to the surety — and the answer has always been, that the surety himself was the proper judge of that — and that no arrangement, different from that contained in his

contract, is to be forced upon him; and bearing in mind that the surety, if he pays the debt, ought to have the benefit of all the securities possessed by the creditor, the question always is, whether what has been done lessens that security.

"In this case, the company were to pay for three fourths of the work done every two months; the remaining one fourth was to remain unpaid for, till the whole was completed; and the effect of this stipulation was, at the same time, to urge Streather to perform the work, and to leave in the hands of the company a fund wherewith to complete work, if he did not; and thus it materially tended to protect the sureties.

"What the company did was perhaps calculated to make it easier for Streather to complete the work, if he acted with prudence and good faith; but it also took away that particular sort of pressure which by the contract was intended to be applied to him. And the company, instead of keeping themselves in the situation of debtors, having in their hands one fourth of the value of the work done, became creditors to a large amount, without any security; and, under the circumstances, I think that their situation with respect to Streather was so far altered that the sureties must be considered to be discharged from their suretyship."

In *General Steam Navigation Co.* v. *Rolt*, 6 C. B. (N. S.) 550, (1859,) upon a second appeal of the case, the Exchequer Chamber held that a plea by a surety to an action to recover from him the excess of cost in completing a ship after the contractor had made default, and also a stipulated sum by way of damages for delay, to the effect that the owner, without the consent of the surety, had allowed the builder to anticipate a greater portion of the last two instalments specified in the contract, and thus materially and prejudicially alter the surety's position, was a *prima facie* answer to the action, and that the onus lay upon the plaintiffs to prove the allegations of their reply that the advances were made with the knowledge and assent and at the request of the surety. It was argued on behalf of the plaintiffs, among other contentions, that under the circumstances in the case there was nothing to show that the defendant could be prejudiced in

his capacity of surety by any of the advances made by the plaintiffs, and therefore he was not discharged from his liability of surety. The appellate court declined to hear counsel for the plaintiffs. In announcing the opinion of the court affirming the judgment below, Pollock, C. B., said, (p. 604):

"Now, certainly, *prima facie*, the withdrawal of a fund which is a security for the thing in respect of the not doing of which he is now called upon to pay damages, is a prejudice to the surety. He is not in the same situation with regard to his principal in which he ought to be placed; he is deprived of the security of the fund out of which the company might in the first instance have indemnified themselves. With regard to the point that there was constructive notice, that has very properly been abandoned by Mr. Welsby. It is clearly not tenable; *prima facie*, the surety was prejudiced by the existing state of things. Whether there could have been any proof to shew that, notwithstanding the appearance of prejudice, in reality none was or could be sustained, it is not at all necessary to inquire. It is, however, exceedingly difficult to conceive any state of things in which it must not to a considerable extent be a prejudice to a surety to have a fund withdrawn which would be in reality the security to the company with whom he is contracting, and to the surety who guarantees."

*Polak* v. *Everett*, 1 Q. B. D. 669, was decided by the Court of Appeal in 1876. Brandt, at page 629 of his Treatise on Suretyship, thus succinctly states the facts and ruling in the case:

"A agreed to redeem certain shares for 6000*l.* within twelve months, and B became his surety. A at the same time transferred to the creditor certain book accounts, amounting to 8000*l.*, with the understanding that they should be collected, and one-half the amount collected should go as payment on the 6000*l.* Afterwards the creditors, for an equivalent in shares and cash, released to A their interest in the book accounts, held, this discharged B altogether from his obligation, even though the book accounts would only have

paid 4000*l* of the 6000*l*, if they had all been collected. This was put upon the ground that the contract for which the surety became responsible had been changed, and he was thereby wholly discharged, the same as if time had been given, or any other material alteration in the original contract had been made."

The three judges of the Queen's Bench agreed upon the proposition that it was an established principle of equity that where time was given by a creditor to the principal debtor without the assent of the surety, there was thereby a violation of rights which the surety acquired when he entered into the suretyship, and that no inquiry could be made into the question of whether the act of the creditor was for the benefit or to the prejudice of the surety. Lord Blackburn thought the same principle should govern in the case before the court where the "equitable right" which the surety acquired when he entered into the suretyship to have the book debts appropriated to reduce the principal debt, had been taken away from him by the act of the creditor in releasing the book debts to the person collecting them. He also (p. 676) called attention to the fact that there was a distinction made in equity between those rights of a surety, which he acquired at the time when he entered into the suretyship and those subsequently acquired, such as the benefit of new securities which might be received by the creditors subsequent to the making of the original contract, and he remarked that the question whether a dealing by the creditor with such new securities would operate to discharge the surety was quite a different question from that before the court.

Mellor, J., said (p. 676) that the question was one of contract, "and the surety is entitled not to be affected by anything done by the creditor, who has no right to consider whether it might be to the advantage of the surety or not. The surety is entitled to remain in the position in which he was at the time when the contract was entered into."

Quain, J., said (p. 677):

"I agree with my brother Mellor, that it is a thoroughly sound and safe principle that, where the act is voluntary and

deliberate, the creditor, altering the contract and rendering it impossible that it should be carried out in its original form, should suffer. This is a sound doctrine, which ought not to be impeached and cannot be impeached, because it is established by authority."

The judgment of the Queen's Bench was affirmed by the Court of Appeal (Jessel, M. R.; Kelly, C. B.; Mellish, L. J., and Denman, J.) without opinion other than the statement that "the court had no doubt that the view taken by the Queen's Bench Division was correct, and affirmed the judgment for the same reasons."

*Holme* v. *Brunskill*, 3 Q. B. D. 495, (1877,) substantially reiterated the principle decided in the earlier cases. Cotton, L. J., with whom concurred Lord Justice Thesiger, said (p. 505):

" The true rule, in my opinion, is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is, without inquiry, evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the court will not, in an action against the surety, go into an inquiry as to the effect of the alteration or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable, notwithstanding the alteration, and that if he has not so consented he will be discharged."

The rulings of this court have been equally emphatic in upholding the right of a surety to stand upon the agreement with reference to which he entered into his contract of suretyship and to exact strict compliance with its stipulations. Thus, in the case of *Miller* v. *Stewart*, 9 Wheat. 680, Mr. Justice Story, in delivering the opinion of the court, said (p. 702):

"Nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended, by implication, beyond the terms of his contract. To the extent, and in the manner, and under the circumstances, pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his contract; and if he does not assent to any variation of it, and a variation is made, it is fatal."

In *Reese* v. *United States*, 9 Wall. 13, Mr. Justice Field, delivering the opinion of the court, said (p. 21):

"It is true, the rights and liabilities of sureties on a recognizance are in many respects different from those of sureties on ordinary bonds or commercial contracts. The former can at any time discharge themselves from liability by surrendering their principal, and they are discharged by his death. The latter can only be released by payment of the debt or performance of the act stipulated. But in respect to the limitations of their liability to the precise terms of their contract, and the effect upon such liability of any change in those terms without their consent, their positions are similar. And the law upon these matters is perfectly well settled. Any change in the contract, on which they are sureties, made by the principal parties to it without their assent, discharges them, and for obvious reasons. When the change is made they are not bound by the contract in its original form, for that has ceased to exist. They are not bound by the contract in its altered form, for to that they have never assented. Nor does it matter how trivial the change, or even that it may be of advantage to the sureties. They have a right to stand upon the very terms of their undertaking."

And the soundness of these opinions was recognized in *Cross* v. *Allen*, 141 U. S. 528, 537, it being held that in the case there before the court the rights of the surety were not altered by certain transactions of which complaint was made, but remained as before.

*Finney* v. *Condon*, 86 Illinois, 78, (1877,) was a dispute over

a building contract. It was held that where, under the terms of a building contract, payments were to be made semi-monthly, according to the estimates of an architect, of a certain proportion of the value of the work done, the surety was bound by the estimates and could not defeat a recovery of damages sustained by reason of the contractor abandoning the completion of the erection of the dwelling houses provided for in the contract, upon the plea that payments in excess of the amount stipulated in the contract were made by the owner. The doctrine, however, enunciated in *Calvert* v. *London Dock Co.* and *Steam Navigation Co.* v. *Rolt, supra,* was approved by the court in the opinion delivered by Mr. Justice Scott, who said (pp. 80, 81):

"The point relied on most confidently in the defence is, that the sureties for the performance of the contract are released from all liability thereon, on account of payment exceeding eighty-five per cent of the work done having been made to the contractor without their consent before the completion of the work. The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed. And there is great justness in the rule adopted. Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and if the principal releases it without their consent it discharges them from their undertaking. The principle is, the withdrawal of the fund agreed upon as security for the performance of the contract without his consent is a prejudice to the surety or guarantor. Sureties and guarantors are not to be made liable beyond the express terms of their engagements. They have the right to prescribe the terms and conditions on which they will assume responsibility, and neither of the principals can change those terms without the consent of the sureties, even with a view to avoid ultimate liability."

Applying the principles, which are so clearly settled by the foregoing authorities, to the case at bar, it is manifest that if

the transaction in February, 1890, by which the Prairie Bank acquired its alleged lien on the fund possessed the effect contended for by the bank, it would necessarily operate to alter and impair rights acquired by the surety under the original contract.

Sundberg & Company could not transfer to the bank any greater rights in the fund than they themselves possessed. Their rights were subordinate to those of the United States and the sureties. Depending, therefore, solely upon rights claimed to have been derived in February, 1890, by express contract with Sundberg & Company, it necessarily results that the equity, if any, acquired by the Prairie Bank in the ten per cent fund then in existence and thereafter to arise was subordinate to the equity which had, in May, 1888, arisen in favor of the surety Hitchcock. It follows that the Court of Claims did not err in holding that Hitchcock was entitled to the fund, and its judgment is therefore affirmed.

*Judgment affirmed.*