In the **MATTER of RAH DEVELOP-MENT COMPANY, INC., Debtor.**

**Bankruptcy No. GK93–82253.**

United States Bankruptcy Court,
W.D. Michigan.

July 21, 1995.

Phillip G. Alber and Michael A. Schwartz, Troy, MI, for Old Republic Sur. Co.

Patrick C. Hall, Troy, MI, for Troy Aggregate Carriers, Inc.

Robert D. Gordon, Chicago, IL, for State of Michigan Laborers' Fringe Ben. Funds and Michigan Carpenters' Fringe Ben. Funds and Special Counsel for Thomas R. Tibble, Chapter 7 Trustee.

Thomas R. Tibble, Chapter 7 Trustee.

## MEMORANDUM OPINION

JAMES D. GREGG, Bankruptcy Judge.

### I. ISSUE

Does a sub-subcontractor on a federal construction project subject to the Miller Act hold an equitable interest in the remaining contract balance now held by the chapter 7 trustee in bankruptcy?

### II. PROCEDURAL BACKGROUND

On May 3, 1993, RAH Development Company, Inc., "Debtor", filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.[1] On March 18, 1994, this court converted the case to chapter 7 and Thomas R. Tibble, "Trustee", was designated by the Office of the United States Trustee to serve as the chapter 7 trustee.

On May 9, 1994, Old Republic Surety Company "Surety", filed its Motion to Determine Priority of Contract Balance together with a supporting memorandum of law. On July 11, 1994, Troy Aggregate Carriers, Inc., "Troy", filed its Motion to Determine Priority of Contract Balance together with a brief in support of its motion.

On June 30, 1994, the State of Michigan Laborers' Fringe Benefit Funds and the Michigan Carpenters' Fringe Benefit Funds, "Benefit Funds", filed their objection to the Surety's motion. On July 27, 1994, the Surety objected to Troy's motion.

On August 1, 1994, the court issued its First Pretrial Order regarding the Surety's and Troy's respective motions. Because the two motions related to many of the same issues, the court consolidated the motions for purposes of pretrial proceedings and eventual hearing. On October 28, 1994, and December 1, 1994, and January 13, 1995, pursuant to consent orders submitted by the parties, the court modified various deadlines in its First Pretrial Order; the hearing on the Surety's and Troy's respective motions was rescheduled for February 22, 1995.

On February 21, 1995, an "emergency joint motion" was filed by the Trustee, the Benefit Funds, and the Surety seeking a separate trial regarding Troy's asserted rights in the balance of the construction contract funds, sometimes referred to as the "VA proceeds." That motion was based upon a representation that the joint movants had reached a settlement premised upon their belief that Troy holds no valid interest in the VA proceeds. The joint movants asserted that if this court determined that Troy was not entitled to any of the remaining contract funds, a trial would be unnecessary and would promote the joint movants' interests in convenience, as well as judicial economy. On February 22, 1995, prior to commencement of the hearing, the joint movants and Troy agreed to a separate hearing to determine if Troy had an interest in the VA proceeds. Issues at the hearing were limited to the following: (1) whether Troy holds an equitable lien on or other similar interest in the VA proceeds; and/or (2) whether a constructive trust was imposed with regard to those proceeds. After the evidentiary hearing was concluded, and in accordance with time deadlines established by the court, the parties submitted post-trial legal memoranda on these two issues.

Therefore, the court's inquiry is a limited one. The court shall not now make any determination regarding Troy's asserted priority over the surety or other claimants to the VA proceeds. Also, this court shall not address whether Troy holds a valid claim against the Surety under the Miller Act performance or payment bonds. *See* 40 U.S.C.

---

1. Unless otherwise noted, all future statutory references are to title 11 of the United States Code, 11 U.S.C. §§ 101–1330, sometimes referred to as the "Bankruptcy Code" or "Code".

§§ 270a–d (1988).[2]

## III. JURISDICTION

■ A bankruptcy court has subject matter jurisdiction over civil proceedings arising in or under a title 11 case, or proceedings related to a title 11 case. 28 U.S.C. § 1334(b). The court has subject matter jurisdiction over this contested matter because it arises under title 11; the court must decide if the VA proceeds are property of the Debtor's bankruptcy estate under 11 U.S.C. § 541.

The determination of what constitutes property of the Debtor's estate under § 541, however, is intertwined with the question of the nature, if any, of Troy's interest in the VA proceeds. For example, in its trial brief Troy argues that *if* the VA proceeds are impressed with a constructive trust, those proceeds do not become property of the Debtor's estate under § 541(d).

On the basis of the exhaustive survey of public construction cases in Part V *infra*, this court concludes that Troy holds an equitable interest in, akin to an equitable lien on,[3] the VA proceeds. Unlike a constructive trust, which forces the debtor, or a trustee, to surrender to the creditor the specific property impressed with the trust, an equitable lien merely gives the creditor an enforceable interest in that property. *See* V SCOTT ON TRUSTS § 463 at 3425 (3d ed. 1967 and Supp. 1985); *see also* 1 POMEROY'S EQUITY JURISPRUDENCE § 165 at 219–220 (Spencer W. Symons ed., 5th ed. 1941). Therefore, like a traditional lien or security interest, property subject to an equitable lien becomes property of the debtor's estate under § 541(a).[4]

Therefore, this court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K), and (O). In addition, the parties consented to this court entering a final order, subject to their respective rights of appeal, regardless of whether the matter is a core proceeding or a noncore, related proceeding. *See* 28 U.S.C. § 157(c)(2). This opinion constitutes the court's findings of fact and conclusions of law, pursuant to FED.R.BANKR.PRO. 7052.

## IV. FACTS

On December 23, 1992, the Debtor entered into a contract with the United States of America, Department of Veterans Affairs, "VA", for the construction of a water main

---

2. The parties' attorneys advised the court that litigation is pending in the United States District Court for the Eastern District of Michigan regarding the Miller Act issues. The parties all stipulated on the record that any findings of fact by this court, to determine the limited issues now before it, would not collaterally estop any other party in the Miller Act litigation.

3. The courts use a number of different terms, including "equitable interest", "equitable lien", and "equitable trust", for the interest recognized by the Supreme Court in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The court uses the term "equitable lien", rather than "equitable interest" or "equitable trust", to distinguish Troy's argument that this court should impose a constructive trust on the VA proceeds. After all, a constructive trust is a recognition of an equitable interest in particular funds. Using the terms "equitable interest" or "equitable trust" would possibly confuse the arguments put forth by the parties. For a brief discussion of constructive trusts versus equitable liens, *see* V SCOTT ON TRUSTS §§ 462, 463 at 3412–13 and 3425–26 (3d ed. 1967 and Supp.1985).

4. The court rejects Troy's assertion that *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) necessitates a finding that the VA proceeds are not property of the Debtor's estate. *Pearlman* was decided under the Bankruptcy Act, which contained a more restrictive definition of property of the estate. 2 NORTON BANKRUPTCY LAW AND PRACTICE 2D § 51:1 at 51–2 (William L. Norton, Jr., ed., 1994) ("The concept of property under Code § 541 is dramatically different from that under § 70 of the Bankruptcy Act.") Concluding that contract retainage funds fall within the definition of property of the estate does not destroy *Pearlman's* essential holding that laborers and materialmen have equitable rights to those funds. *Cf.* William F. Haug and Janis M. Haug, *Bankruptcy 1984 vs. The Surety's Right to Contract Proceeds*, 20 FORUM 725 (Summer, 1985) (emphasis added) ("The emerging case law, however, casts doubt on the survival of *Pearlman's* holding, *insofar as keeping the undisbursed contract balances out of the bankruptcy estate.* But, the possibility that § 541 includes contract balances should not necessarily strike fear into the hearts of sureties. It does not necessarily follow that the surety's jealously guarded subrogation rights are in peril and at the mercy of trustees or debtors in possession of the bankrupt's estate.")

loop project at the VA Medical Center in Ann Arbor, Michigan. The contract pertained to "general construction", including alterations, roads, walks, grading, drainage, utility systems, water meter facilities, and necessary removal of existing structures and construction of certain other items" pursuant to work "indicated on the drawings". (Exhibit 1.) The contract amount was $470,000.[5]

On May 7, 1993, four days after the Debtor filed its chapter 11 petition, it entered into a "Sub-contract Agreement" with Sinacola Midwest, Inc., "Sinacola". That contract required Sinacola to provide excavating, backfilling, compaction, loading and certain fencing for the VA water main project. (Exhibit 2.) The Sinacola subcontract amount was $128,642.

At the time the Debtor, through its president, Samuel Hayes, entered into the contract with Sinacola, there was no disclosure of the pendency of the Debtor's chapter 11 case. Sinacola first learned about the Debtor's bankruptcy case some time in February, 1994, shortly before the case was converted to chapter 7. At that time, the Debtor owed Sinacola approximately $119,000 on the subcontract, which still remains unpaid.

From May 18, 1993 to July 23, 1993, Troy supplied materials, such as cobblestone, sand, topsoil, and pea pebbles, and hauled those materials by truck to the VA construction project. (Exhibit 3.) Troy is still owed $47,-900.42 for those materials and the hauling services.

The agreement relating to the materials and services was between Troy and Sinacola. Invoices were submitted by Troy to Sincola rather than by Troy to the Debtor. Troy had no contract directly with the Debtor. Although Troy asserts that the Debtor is contractually obligated to pay Troy, there exists no persuasive evidence which supports this assertion. Although Sinacola's president testified that the Debtor's president had guaranteed payment of Troy's indebtedness, and Sinacola had given Troy's invoices to the Debtor's president on two occasions, there is no written document to support the assertion of a payment guarantee from the Debtor to Troy.[6] The court finds the Debtor to be the prime contractor and Troy to be a sub-sub-contractor.

It now appears that the VA is prepared to pay, or has paid, $52,450.04 to the Trustee. Although the court acknowledges that the evidence adduced at the hearing did not explicitly address this fact, the attachments to the Surety's motion and Troy's post-trial brief support such an implicit finding.[7] Therefore, the VA does not now claim entitlement to any remaining contract balance and the balance is actually, or constructively,

---

5. Although there is some indication there may have been one or more contract modifications, and an increase in the contract amount, the record is insufficient to determine what these modifications may have been. In any event, the court believes any such modifications likely are immaterial to the issues presented.

6. In paragraph 11, at page 4, of its post-trial brief, Troy asserts that "[f]or purposes of this project [Sinacola] was the alter ego of [the Debtor] and Sinacola its agent." Such a finding is not supported by the record from the hearing.

7. On April 15, 1994, the Debtor's president sent a letter to the VA contracting officer requesting that all remaining contract payments be sent to the Trustee. (Exhibit B attached to Surety's motion.) On April 18, 1994, the Surety's attorney wrote to the VA contracting officer demanding payment of all contract balances. The Surety claimed any unpaid contract balance pursuant to a General Agreement of Indemnity executed by the Debtor which provided that "the contract balances shall be deemed trust funds to be held for the benefit of subcontractors and suppliers"

and assigns rights to the Surety to monies due as a result of the contract. (Exhibit C attached to Surety's motion.)

On April 20, 1994, the VA contracting officer wrote to the Surety's attorney and advised him that $52,450.04 would be paid to the Trustee within fifteen calendar days, unless a bankruptcy court order directed the VA to pay the Surety. (Exhibit D attached to Surety's motion.) A review of the court's file indicates that, to date, no order has been issued to the VA pertaining to the contract balance. FED.R.EVID. 201. In its post-trial brief, Troy asserts the VA is holding $52,-456.42 as the contract balance. The Benefit Funds and the Trustee do not state the amount of the outstanding balance in their papers submitted to the court.

To the extent any party believes additional evidence relating to the contract balance amount, or the VA's willingness to pay the balance without setoff, is both necessary and relevant, the court will entertain a timely motion under FED.R.BANKR.P. 9023.

held by the Trustee for payment to entities that are entitled to receive the VA proceeds.

## V. DISCUSSION

■ The sole issue now before the court is whether Troy, a sub-subcontractor with no direct contractual relationship with the VA or the Debtor, may assert a claim to the VA proceeds held by the Trustee. Troy bases its claim to the proceeds on two equitable theories. First, Troy asserts, based on the Supreme Court's decision in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), that it has an equitable interest in, akin to an equitable lien on, the VA proceeds. *See supra* note 3. Second, Troy claims that it is the beneficiary of a constructive trust imposed on the VA proceeds. *See infra* Part V.2. of this opinion.

### 1. *Equitable Lien on VA Proceeds*

Troy argues that *Pearlman* and its progeny establish that unpaid subcontractors and materialmen have what amounts to an equitable lien on undisbursed construction contract funds.[8] As a result, Troy states that it may claim the specific contract proceeds held by the Trustee. The Trustee, the Surety, and the Benefit Funds disagree. They argue that Troy misconstrues the language of *Pearlman,* whose only clear holding, they claim, is that a federal construction project surety that has paid subcontractors prevails over the general contractor's bankruptcy trustee in a contest over remaining contract proceeds. Any other interpretation of *Pearlman,* they argue, would overrule the Court's pre-*Pearlman* decisions, without any explicit recognition by the *Pearlman* majority of this significant departure from established case law. Thus, the Trustee, the Surety, and the Benefit Funds assert that Troy may only collect from the Surety on the Miller Act payment bond, or from the subcontractor, Sinacola.

### a. *The Supreme Court Cases*

*Pearlman* did not arise in a vacuum; its holding is set against a backdrop of several public construction cases dating back to the 1890's. The first of these cases, *Prairie State Nat'l Bank v. United States,* 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), involved a contest between a public construction surety and an assignee bank for the 10% contract retainage held by the government.

In *Prairie State National Bank,* Sundberg contracted to build a customhouse for the federal government. The contract provided that the government would make progress payments during the construction project in the amount of 90% of work completed at the time of the payment; the government would retain the other 10% of each progress payment until the entire project was complete. Upon default, Sundberg would forfeit its right to the 10% retainage.

Sundberg defaulted. Hitchcock, the surety, completed performance on the customhouse and asserted an interest in the 10% retainage held by the government. Prairie State National Bank, which had loaned about $6,000 to Sundberg in consideration for an assignment of Sundberg's right to receive the final contract payment, also asserted an entitlement to the retainage.

The Supreme Court decided in favor of the surety Hitchcock stating that it was "elementary" that the surety could invoke the doctrine of equitable subrogation. Equitable subrogation allowed the surety, who had completed the contractor's performance under the contract, to step into the shoes of the government and assert any rights that the government had to withhold or retain funds upon default of the general contractor.

A great deal of confusion has arisen in the case by treating Hitchcock as subrogated merely "in the rights of Sundberg & Co." in the fund, which, in effect, was saying that he was subrogated to no rights whatsoever. Hitchcock's right of subrogation, when it became capable of enforcement, was a right to resort to the securities and remedies which the creditor (the United States) was capable of asserting against its debtor, Sundberg & Co., had the security not satisfied the obligation of the contractors; and one of such remedies

---

8. Troy then asserts that its equitable right to the VA proceeds removes those proceeds from the Debtor's bankruptcy estate. The court has already rejected this contention. *See supra* note 4.

was the right, based upon the original contract, to appropriate the 10 per cent. retained in its hands.... The right of Hitchcock to subrogation, therefore, would clearly entitle him, ..., to be substituted to the rights which the United States might have asserted against the fund.

*Prairie State Nat'l Bank,* 164 U.S. at 232–33, 17 S.Ct. at 144. Thus, even though no express contractual right to subrogation existed, the Court recognized Hitchcock's right to payment from the contract retainage. This doctrine of equitable subrogation allowed the Court to reach a just result, preventing the unjust enrichment of Sundberg, who had failed to complete performance of the federal government project. *See* 10 WILLISTON ON CONTRACTS § 1265 at 845 (Walter H.E. Jaeger ed., 3d ed. 1967) (footnote and citation omitted) (" 'The object of subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment.' ").

The Court then determined that Hitchcock's equitable interest in the retainage arose when Hitchcock became the surety on the government project, even though the retainage fund was not yet in existence. As a result, the surety's equitable interest in the fund predated that of Prairie State National Bank, and Prairie State National Bank's interest in the retainage "was subordinate to the equity which had in May, 1888, arisen in favor of the surety, Hitchcock." *Prairie State Nat'l Bank,* 164 U.S. at 240, 17 S.Ct. at 147.

In *Henningsen v. United States Fidelity & Guaranty Co.,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), the Court extended the rationale of its decision in *Prairie State National Bank* to cover not only sureties that have completed performance on public construction projects, but also sureties that have paid laborers and materialmen [9] pursuant to

payment bonds. *Henningsen* involved a contest between the surety and an assignee bank for monies due upon a federal construction contract. Weighing the "respective equities of the parties", the Court concluded that the equity of the surety was superior to that of the bank. Thus, *Prairie State National Bank* and *Henningsen* together establish the surety's equitable claim to a contract retainage, whether the surety has acted pursuant to a performance bond or a payment bond.

*Henningsen* did not directly discuss the rights of laborers and materialmen to contract retainage funds. Nonetheless, *Henningsen* contains some interesting dicta about the government's equitable obligation to laborers and materialmen. In explaining the surety's superior right to the undisbursed contract funds, the Court stated that the surety had "paid the laborers and materialmen, and thus [had] released the contractor from his obligations to them, and to the same extent [had] *released the government from all equitable obligations to see that the laborers and supplymen were paid."* *Henningsen,* 208 U.S. at 410, 28 S.Ct. at 391 (emphasis added). This dicta, while not recognizing any equitable interest on the part of laborers and materialmen to the contract retainage, is the first suggestion that equity might create rights that the laborers and materialmen could assert against parties with whom they were not in contractual privity.

The Court directly addressed the issue of laborers' and materialmen's rights to contract retainage funds in *Martin v. National Surety Co.,* 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937). In *Martin,* the federal government entered into a contract with Tobin, a general contractor, for construction of a post office in Carlinville, Illinois. National Surety Company, through its agent Martin, provided a payment bond, as required by federal law, to guarantee payment to laborers and materialmen working on the post office construction project. Tobin assigned

---

9. The controversy now before the court involves the sub-subcontractor Troy, which provided labor and materials to Sinacola, the Debtor's subcontractor. The Supreme Court cases involve the rights of sureties, laborers and materialmen; not one discusses the rights of sub-subcontractors. The court discusses the significance, if any, of this distinction *infra* at Part V.1.c. of this opinion.

to National Surety any payments remaining due on the contract upon Tobin's default; Tobin also agreed to make no other assignments of the contract funds.

National Surety subsequently terminated Martin, who later loaned more than $10,000 to Tobin in exchange for Tobin's agreement to divide the profits from the post office construction project. As the building neared completion, National Surety grew concerned because Tobin had failed to pay many of his laborers and materialmen; National Surety asked Tobin to complete a power of attorney, enabling it to directly receive monies due on the construction project. Instead, Tobin executed a power of attorney in Martin's favor, essentially assigning to him the right to receive the contract funds remaining with the federal government.

When National Surety learned that Martin had collected more than $10,000 in contract funds from the government, National Surety filed suit in federal district court against Tobin, Martin, and certain federal government officials on behalf of the laborers and materialmen. National Surety subsequently became insolvent and renounced any rights to the $10,000 in favor of the unpaid laborers and materialmen. Thus, the litigation proceeded on the basis of the laborers' and materialmen's right to the $10,000 in contract funds that Martin earlier had deposited with the district court, pursuant to court order.

The Supreme Court upheld the lower court's ruling that Martin's interest in the contract funds was subordinate to that of other creditors, including the laborers and materialmen. The Court rejected the argument that because federal law rendered null and void any assignment of a claim against the United States, the Court could not recognize the general contractor's assignment of its right to contract funds to National Surety. The Court explained that the anti-assignment statute existed to protect the federal government from having to sort through conflicting claims to contract funds in its possession. Once contract funds passed out of the government's hands, however, as in *Martin*, the statute's rationale for voiding assignments disappeared. Recognizing that the assignment was invalid as a matter of law, the Court saw no reason not to give effect to the assignment, albeit on equitable grounds, so long as doing so did no violence to the purpose of the anti-assignment statute. Moreover, Martin, who sought to void the assignment on legal grounds, had obtained his interest in the contract funds with notice of the earlier assignment by Tobin to National Surety.

> After payments have been collected and are in the hands of the contractor or subsequent payees with notice, assignments may be heeded, *at all events in equity,* if they will not frustrate the ends to which the [statutory] prohibition was directed. . . .
>
> An assignment ineffective at law may none the less amount to the *creation of an equitable lien* when the subject matter of the assignment has been reduced to possession and is in the hands of the assignor or of persons claiming under him with notice. . . . Far from defeating or prejudicing the interests of the Government, the recognition of the equities growing out of the relation between the contractor and the surety will tend, as already has been suggested, to make those interests prevail.

*Martin*, 300 U.S. at 596–97, 57 S.Ct. at 535 (citations omitted) (emphasis added). Thus, the Court found that the assignment to National Surety, albeit void at law, had created an equitable lien in the contract funds, to be used for the benefit of unpaid laborers and materialmen.

The Court did not go so far as to find that laborers and materialmen *themselves* held an equitable lien on the contract funds. Rather, laborers and materialmen were the beneficiaries of the *surety's* equitable lien on the contract funds, which the Court imposed in order to give effect to the general contractor's assignment. The Court expressly noted that while it affirmed the decision of the Court of Appeals, it did so on grounds narrower than those articulated by that lower court. The Eighth Circuit "placed its ruling upon the broad ground that, apart from any assignment or any statute, *the proceeds of a building contract are chargeable in favor of materialmen with an equitable lien,* which attached upon collection, even if not before,

and which cannot be overridden at the will of the contractor by payment to his other creditors, though the payment be made in fulfillment of a promise." *Martin*, 300 U.S. at 593, 57 S.Ct. at 533 (emphasis added). Thus, it is noteworthy that the Eighth Circuit had previously held that the laborers and materialmen themselves held an equitable lien on the remaining contract funds.

*Martin* is a confusing opinion when read in isolation. After all, *Prairie State National Bank* and *Henningsen,* when read together, establish the basic principle that sureties that either have completed performance of a public construction contract, pursuant to a performance bond, or have paid laborers and materialmen on such a project, pursuant to a payment bond, are equitably subrogated to the federal government's right to any retainage funds. If these two cases established the surety's right to equitable subrogation, why did the Court in *Martin* not rely on *Prairie State National Bank, Henningsen* and that well-established doctrine of equitable subrogation? The answer lies in a basic condition of equitable subrogation: until a debt is fully paid, the surety's right to subrogation does not arise.

> A surety who has undertaken to pay the creditors of the principal, though not beyond the stated limit, may not share in the assets of the principal by reason of such payment until the debts thus partially protected have been satisfied in full. This is the rule where the right to a dividend has its basis in the principle of equitable subrogation. "A surety liable only for part of the debt does not become subrogated to collateral or to remedies available to the creditor unless he pays the whole debt or it is otherwise satisfied." *United States v.*

*National Surety Co.,* 254 U.S. 73, 76, 41 S.Ct. 29, 30, 65 L.Ed. 143 (1920).

*American Surety Co. v. Westinghouse Elec. Mfg. Co.,* 296 U.S. 133, 137, 56 S.Ct. 9, 11, 80 L.Ed. 105 (1935) (footnote omitted) [10]; *see also* 10 WILLISTON ON CONTRACTS § 1269 at 857–58 (Walter H.E. Jaeger ed., 3d ed. 1967). In other words, even though a surety is contractually limited, by the terms of its payment bond, to pay only a certain amount to laborers and materialmen upon the general contractor's default, the surety's right to equitable subrogation does not arise until those laborers and materialmen are fully paid.

In *Martin,* the surety became insolvent during the course of the district court trial. Because the general contractor's laborers and materialmen had not been paid in full, the surety in *Martin* could not claim any rights to the contract funds on the basis of equitable subrogation. Nonetheless, the Supreme Court still found that the surety held an equitable lien on the contract funds. It reached this result, however, by giving effect to the contractor's assignment to the surety, albeit on equitable grounds. Thus, the laborers and materialmen, as beneficiaries of that assignment, were entitled to the contract funds, which enabled the court to rule on the narrower ground of assignment, rather than holding that the laborers and materialmen *themselves* held an equitable lien on the contract funds.

The Supreme Court once again took up the question of the rights of laborers and materialmen in *United States v. Munsey Trust Co.,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The Trustee and the Benefit Funds argue in their brief that *Munsey Trust* pre-

---

10. *American Surety Co. v. Westinghouse Elec. Mfg. Co.,* 296 U.S. 133, 56 S.Ct. 9, 80 L.Ed. 105 (1935) involved a bankrupt general contractor. Contract retainage funds had been paid over to the contractor's trustee in bankruptcy. The surety paid the amount owing on the payment bond, which did not satisfy all of the claims of laborers and materialmen of the general contractor. The surety, however, argued that under the doctrine of equitable subrogation it was entitled to the contract retainage. The Supreme Court disagreed, holding that the laborers and materialmen had an interest in the fund superior to that of the surety. The Court explained that the contrac-

tor's laborers and materialmen had two *independent* avenues of relief: (1) proceeding against any assets of the contractor; and (2) recovering on the payment bond. Allowing the surety to share in the distribution of the contractor's assets in bankruptcy with laborers and materialmen "would reduce the protection of the bond to the extent of the [surety's] dividend in the assets of the debtor." *Id.* at 137, 56 S.Ct. at 11 (citation omitted). Moreover, the Court noted that a basic principle of suretyship was that a surety's right to equitable subrogation only arises upon payment in full of the debt owed upon the contractor's default.

cludes this court from recognizing that laborers and materialmen hold an equitable lien against public construction contract funds or retainage. *Munsey Trust,* however, is a complex opinion which expressly declines to address the exact issue now facing this court.

In *Munsey Trust,* the Federal Contracting Corporation, the general contractor, entered into six different contracts with the federal government. Aetna Casualty and Surety Company provided both payment and performance bonds on all six projects and, in return, obtained an assignment of the contractor's claims against the government in the event of the contractor's default on any of the six contracts. Federal completed performance of the six contracts, but failed to pay more than $13,000 to laborers and materialmen on those jobs. Aetna paid these claims, pursuant to its obligations under the payment bonds. Federal later won a bid for another public project with the government. Federal defaulted and, as a result, the government incurred more than $6,700 in damages. The government set off its damages against more than $12,000 in retainage it held from the first six contracts. The surety received the remaining retained funds but contested the government's right to setoff.

The surety argued that its claim to the retainage was superior to that of the government because it was subrogated to the rights of both the federal government and the laborers and materialmen. The Supreme Court rejected the surety's argument. The Court explained that the surety was not subrogated to the government's right to the retainage. The surety argued that the government retained a percentage of the contract payments to ensure not only completion of the contract, but also payment of the laborers and materialmen. The Court disagreed with this assertion, concluding that "it seem[ed] more likely that completion of the work on time is the only motive" for the government's retaining a percentage of contract payments. *Munsey Trust,* 332 U.S. at 243, 67 S.Ct. at 1603 (citations omitted).

The Court also disagreed with the surety's assertion that it derived its rights to the retainage by subrogation to the laborers' and materialmen's rights to the retained contract funds.

> If the United States were obligated to pay laborers and materialmen unpaid by a contractor, the surety who discharged that obligation could claim subrogation. But nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation.... They cannot acquire a lien on public buildings ... and as a substitute for that more customary protection, the various statutes were passed which require that a surety guarantee their payment. Of these, the last and the one now in force is the Miller Act under which the bonds here were drawn.

*Munsey Trust,* 332 U.S. at 241, 67 S.Ct. at 1602 (citations omitted). This language from *Munsey Trust* suggests that laborers and materialmen have no lien or other claim to retained contract funds; instead, the Miller Act payment bond provides the protection that a lien normally affords laborers and materialmen on non-federal construction projects. And it is this language from *Munsey Trust* that the Trustee and the Benefit Funds have seized upon to support their assertion that Troy has no rights to the VA proceeds in the Trustee's possession.

The court disagrees with this interpretation of *Munsey Trust.* First, the Supreme Court in *Munsey Trust* expressly stated that it was not deciding that laborers and materialmen, left unpaid by both the general contractor and the surety, had no rights to contract retainage funds.

> We need not decide whether laborers and materialmen would have any claim to the retained percentages, if both contractor and surety failed to pay them. Even if they do, certainly those would be rights to which the surety could not be subrogated for by hypothesis it would have done nothing to earn subrogation.

*Munsey Trust,* 332 U.S. at 242, 67 S.Ct. at 1603. The Court *did* decide that a surety could not lay claim to the contract retainage based on equitable subrogation to the laborers' and materialmen's claim for payment against the federal government. That conclusion was not based on the absence of *any*

cognizable claim, whether legal or equitable, by laborers and materialmen against the federal government. Rather, it was based on the inability of laborers and materialmen to *enforce* a claim against the federal government because of sovereign immunity. The language from *Munsey Trust* provides that laborers and materialmen have no *enforceable rights* against the government, not that they have no rights at all. *See Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.,* 960 F.2d 366, 375–76 (3d Cir. 1992).

Second, the Supreme Court in *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) traces the surety's rights to contract retainage funds through the equitable claims of laborers and materialmen to those funds. Pearlman was the trustee for Dutcher Construction. Prior to filing for bankruptcy, Dutcher had contracted with the federal government to perform work on the St. Lawrence Seaway. Reliance Insurance Company provided the payment and performance bonds required by the Miller Act. Dutcher ran into financial difficulties and never completed the project. In addition, Dutcher failed to pay almost $350,000 owed to laborers and materialmen. Reliance discharged those obligations pursuant to the payment bond. The government hired another contractor to complete the project, at which time there remained more than $87,-000 in retainage from Dutcher's work on the construction project. The government turned those funds over to the trustee Pearlman, who argued that they belonged to Dutcher's bankruptcy estate. The surety claimed the retainage as its own, arguing the money never became part of the debtor's bankruptcy estate.

The Supreme Court agreed with the surety. First, the Court reviewed its prior decisions in *Prairie State National Bank* and *Henningsen* and concluded that those cases "establish[ed] the surety's right to subrogation in such a [retained] fund whether its bond be for performance or payment." *Pearlman,* 371 U.S. at 139, 83 S.Ct. at 236. Next, the Court found that nothing in the language of the Miller Act or in the Act's legislative history indicated that Congress intended "to repudiate the equitable doctrine" established in *Prairie State National Bank* and *Henningsen. Id.* at 140, 83 S.Ct. at 236. Finally, the Court explained that *Munsey Trust* was not a radical departure from prior law. *Munsey Trust* merely stood for the "well-established common-law right of debtors to offset claims of their own against their creditors." *Id.* at 140, 83 S.Ct. at 237. Nothing in that decision, said the Court, disturbed the principles laid down in *Prairie State National Bank* and *Henningsen.*

After having determined that *Prairie State National Bank* and *Henningsen* were still good law, the Court held that the surety had the right to the retained funds. The surety prevailed over the trustee because under the Bankruptcy Act the retainage never became part of the bankruptcy estate in the first instance.

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it.

*Pearlman,* 371 U.S. at 141–42, 83 S.Ct. at 237 (footnote omitted).

Even though the Court stated that it was following the well-established principle of equitable subrogation set forth in *Prairie State National Bank* and *Henningsen,* the basis for invoking that doctrine was expanded in *Pearlman.* Neither *Prairie State National Bank* nor *Henningsen* rested the surety's equitable subrogation claim to retainage funds on the laborers' or materialmen's equitable lien on those funds; rather, the surety was equitably subrogated to the federal government's right to the retainage.

*Pearlman,* on the other hand, equitably subrogated the surety to the equitable rights

of laborers and materialmen to the retainage. Justice Clark, joined by Justices Douglas and Brennan, concurred in the majority's result but expressed concern with what he considered an unnecessary expansion of prior law.

> The Court holds that the surety company here is entitled to the funds the Government has paid into court on the theory that the surety is subrogated to the claims of the laborers and materialmen which it has paid. I cannot agree. None of the cases in this Court so hold.

*Pearlman*, 371 U.S. at 142, 83 S.Ct. at 237 (Clark, J., concurring). Justice Clark argued that the majority could have reached the same result, but on the narrower grounds enunciated in the Court's earlier opinion in *Martin* the general contractor's assignment to the surety of the contractor's right to contract payments.

> It would, therefore, be my view that the equities existing here in favor of the surety grow out of the contract between it and the contractor (in whose shoes the trustee now stands), which was made in consideration of the execution of the bond. Under that agreement in the event of any breach or default in the construction contract all sums becoming due thereunder were assigned to the surety to be credited against any loss or damage it might suffer thereby.

*Pearlman*, 371 U.S. at 143, 83 S.Ct. at 238 (Clark, J., concurring). Justice Clark even noted that the Court in *Martin*, on the basis of identical[11] facts, had expressly rejected the broader position taken by the majority in *Pearlman*. According to the concurrence, the *Pearlman* majority, in basing its result on the equitable lien of laborers' and materialmen, adopted the position taken by the Eighth Circuit but previously rejected by a unanimous Court in *Martin*.

### b. *Pearlman's Progeny*

*Pearlman* establishes the right of a surety who has paid laborers and materialmen, pursuant to a public construction payment bond, to be equitably subrogated to the rights of those laborers and materialmen to receive remaining contract proceeds. *Pearlman*, 371 U.S. at 140, 83 S.Ct. at 237. Old Republic argues that *Pearlman* is not determinative of the issue in this contested matter because *Pearlman* was decided under the Bankruptcy Act, not the Bankruptcy Code. But, the fact that *Pearlman* was decided under the Bankruptcy Act, is relevant only to the property of the estate issue, not to the equitable interests of Troy to the contract proceeds. *Cf. supra* note 4. In addition, several courts in recent years, in both bankruptcy and non-bankruptcy cases, have recognized the continued vitality of *Pearlman*'s holding, despite the enactment of the Bankruptcy Code.

In *Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*, 960 F.2d 366 (3d Cir.1992), Gittens, the general contractor, filed for protection under chapter 11. At the time of the bankruptcy filing, city, state and federal agencies owed Gittens money for contracts completed for those various government agencies. Gittens argued that these contract proceeds belonged to his bankruptcy estate and could be used to fund new corporate ventures. Universal Bonding, Gittens' surety on the various public construction projects, objected, claiming the contract proceeds were held in either statutory or equitable trusts for the benefit of unpaid laborers and materialmen.

After addressing the rights of laborers and materialmen to contract funds held by the state and municipal agencies, the court in *Gittens* looked to *Pearlman* to decide the federal construction law issue. The *Gittens* court noted the apparent inconsistency between *Pearlman*'s recognition that unpaid laborers and materialmen possess rights to public construction contract balances and *Munsey Trust's* statement that laborers and materialmen do not have enforceable rights against the United States for compensation. Agreeing with the analysis of the Court of Claims in *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) (en banc), the Third Circuit in *Gittens* concluded that sovereign immunity

---

**11.** The facts, however, were not identical. The Court in *Martin* had to rely on the assignment because laborers and materialmen had not been paid in full. Thus, the doctrine of equitable subrogation did not apply. In *Pearlman*, the laborers and materialmen were fully paid, so the surety could use the doctrine of equitable subrogation in order to assert rights in the retainage.

was the key to reconciling the *Pearlman* and *Munsey Trust* decisions.

The Court of Claims resolved the apparent conflict by noting that the *Munsey* Court had stated only that, in light of the federal government's sovereign immunity, laborers and contractors possessed no *enforceable* rights against the funds retained by the government, not that they possessed no rights in those funds at all.

\* \* \* \* \* \*

We agree with the Court of Claims that unpaid laborers and materialmen possess, but may not enforce through suit against the government, an equitable interest in contract balances retained by the government. It was this equitable interest to which the surety was subrogated in *Pearlman.*

*Gittens,* 960 F.2d at 375–76 (emphasis in original). The court then explained that although the laborers and materialmen had an equitable interest in the construction contract proceeds, they could not enforce that interest so long as the contract funds remained in the hands of the federal government. Once the government paid over those funds to Gittens, however, the proceeds were held in an equitable trust for the benefit of laborers and materialmen. Universal Bonding, the surety, would become the trust's beneficiary upon satisfying its obligation to pay the laborers and materialmen.

The Second Circuit, in an earlier nonbankruptcy case, also upheld the vitality of *Pearlman*'s holding that sureties derive their right to equitable subrogation from the equitable interests of laborers and materialmen to public construction contract proceeds. In *Active Fire Sprinkler Corp. v. United States Postal Service,* 811 F.2d 747 (2d Cir.1987), Active, the unpaid subcontractor on a construction project for the United States Postal Service, sued the postal service and the general contractor, Brady. Active argued that it was entitled, under an equitable lien theory, to construction funds owed by the postal service to Brady. After concluding that sovereign immunity did not preclude Active's suit against the postal service and that the Miller Act was not Active's sole remedy, the Second Circuit turned to Active's equitable rights theory.

Active asserts that it had equitable rights in the Contract Balance held by [the postal service] at the time this suit (the Lien Action) was commenced. We agree. It is not new law that unpaid subcontractors hold an equitable interest in a contract balance owed by a building owner to a general contractor.

\* \* \* \* \* \*

Simply put, the equitable rights of sureties derive from the equitable rights of the class protected by the bond—in this case, the subcontractors. In *Henningsen,* the Supreme Court stated that the government has an equitable obligation to ensure the payment of laborers and materialmen on government construction projects. 208 U.S. at 410, 28 S.Ct. at 391. *Pearlman* states that laborers have the right to be paid out of an unpaid contract balance when an insolvent general contractor fails to pay them. 371 U.S. at 141, 83 S.Ct. at 237. In both cases, the sureties, who had compensated the unpaid laborers and suppliers, had claims to the unpaid contract balances superior to the claims of bankruptcy estates and creditors. The sureties' claims arose because the sureties were subrogated to the rights of the suppliers and laborers. *See id.; Henningsen,* 208 U.S. at 410, 28 S.Ct. at 391. Any rights held by the sureties were founded upon the rights of the unpaid laborers and suppliers.

*Active Fire Sprinkler,* 811 F.2d at 755–56 (citations omitted).

The district court in *United States v. TAC Construction Company,* 760 F.Supp. 590 (S.D.Miss.1991) cited from this passage in *Active Fire Sprinkler* to support its conclusion that subcontractors and suppliers have the highest priority to federal construction contract proceeds. In *TAC,* the federal government filed an interpleader action, depositing into the court's registry part of the contract balance due to TAC under its contract with the government. Numerous subcontractors and suppliers intervened in the action. Two banks also laid claim to the contract funds, on the basis of an assignment of

TAC's interest in the contract proceeds and the granting of a security interest in TAC's contract rights.

The *TAC* court, required to sort out the priorities among these competing claimants, ruled in favor of the suppliers and subcontractors. Although the facts of the case do not make clear whether the sub-subcontractors and sub-subsuppliers had intervened in the interpleader action, the court addressed those parties' rights, stating that "a sub-subcontractor [could] not claim proceeds of the prime contract if the sub-subcontractor's subcontractor ha[d] already included the sub-subcontractors' claim in its claim against the proceeds." *United States v. TAC Construction Co.*, 760 F.Supp. at 596. This result makes sense because it prohibits double-dipping. What rights does a sub-subcontractor have to prime contract proceeds when the subcontractor *does not* make a claim for the proceeds of the prime contract (or does not include the sub-subcontractor's claim within its own)? Although the *TAC* court does not explicitly decide this issue, the court's language strongly suggests that the sub-subcontractor has a right to proceeds from a prime contract when double-dipping will not occur.

The district court's decision in *TAC* was central to the bankruptcy court's resolution of a priority dispute between the federal government and unpaid subcontractors in *United States v. Maxwell (In re Pyramid Indus.)*, 170 B.R. 974 (Bankr.N.D.Ill.1994). In *Pyramid*, the court "navigated a thicket of public construction cases", including the Supreme Court's decisions in *Prairie State National Bank, Henningsen, Munsey Trust,* and *Pearlman.* The court concluded that these four cases, when read together, established a hierarchy of entitlement to unpaid federal construction contract balances. And that hierarchy gave priority to unpaid subcontractors (or to sureties that had paid those subcontractors) over the general contractor or the bankruptcy trustee. In fact, only the federal government, exercising its right to setoff, stands in line before unpaid subcontractors. *See* 170 B.R. at 980.

### c. *Summary*

■ This court's own navigation through the "thicket of public construction cases", both on the Supreme Court and lower federal court levels, leads to one inescapable conclusion: unpaid providers of labor and materials on Miller Act construction projects possess an equitable interest in, akin to an equitable lien on, contract proceeds. The court acknowledges that only one court, in the *TAC* case, addressed the equitable rights of sub-subcontractors, and that court did so only in passing. Nonetheless, the principles set forth in the case law apply equally to subcontractors and sub-subcontractors. *See supra* note 9. The sub-subcontractor's lack of privity with the government or the contractor-debtor does not alter the holding in *Pearlman.* The rights established in the case law rest on equitable, not contractual, principles. Lack of privity is therefore irrelevant. The court concludes that Troy, as an unpaid sub-subcontractor on the VA project, has an equitable lien on the remaining VA proceeds.

### 2. *Constructive Trust*

Troy also claims that it is the beneficiary of a constructive trust imposed on the VA proceeds. The Trustee, the Surety, and the Benefit Funds cite to the Sixth Circuit's decision in *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir. 1994) to refute Troy's contention that the VA proceeds were impressed with a constructive trust in its favor. Although this court fully agrees with, and is bound by *Omegas*, given the court's holding that Troy has an equitable lien on the VA proceeds, this court need not reach the constructive trust issue.[12]

### VI. CONCLUSION

The court holds that the VA proceeds are property of the Debtor's estate. Troy holds an equitable lien on those proceeds. The parties have stipulated, for purposes of this hearing, that Troy is owed $47,900.42. The amount to which Troy's debt is equitably secured by the VA proceeds depends on a

---

**12.** There is dicta in *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir.1994), which may, or may not, affect the constructive trust analysis in construction contract cases. *Id.* at 1451.

subsequent determination as to Troy's priority, if any, over the Surety and other claimants to those proceeds.

This court shall conduct another pretrial conference and schedule another hearing to consider all remaining issues regarding the parties' asserted entitlement to the VA proceeds and, if necessary, their respective priority to those proceeds.